Janice M. KLAWES, individually and as personal representative of the Estate of Allen D. Klawes, Plaintiff,

v.

FIRESTONE TIRE & RUBBER COMPANY, Defendant.

No. 81-C-1552.

United States District Court, E.D. Wisconsin.

Sept. 21, 1983.

Robert A. Christensen and Steven P. Morstad, Foley & Lardner, Milwaukee, Wis., for plaintiff.

Robert I. DuMez, Joling, Rizzo & Willems, S.C., Kenosha, Wis., for defendant.

## DECISION AND ORDER

WARREN, District Judge.

On December 28, 1978, Allen Klawes, a chief truck mechanic for Redway Carriers, Inc., of Kenosha, was affixing a truck rim and tire to a vehicle in his place of work. In the process, the truck tire and multipiece truck rim separated explosively causing fatal injuries to his face and head. On November 16, 1981, an action was filed by plaintiff, on behalf of decedent and herself, in Kenosha County Circuit Court. On December 8 of the same year, defendant

removed the matter to federal court and, on December 15, filed an answer.

On December 18, 1981, plaintiff filed an "Offer and Demand for Settlement" wherein, pursuant to § 807.01(4), Wis.Stats., it offered to accept $1,500,000 in full settlement of all causes of action. A flurry of discovery followed during the spring and summer of 1982. During this period, defendant moved to strike plaintiff's offer of settlement, and plaintiff moved for an order compelling defendant to answer certain interrogatories. Further, defendant moved for partial summary judgment.

These motions have been briefed and are overripe for decision.

## MOTION TO STRIKE

In this motion, defendant takes the position that the plaintiff's Offer of Settlement, made in accordance with Wis.Stat. § 807.01, is void in the context of this federal case. Plaintiff argues that the federal courts have their own offer of judgment procedure and sanctions in Rule 68 of the Federal Rules of Civil Procedure, which provides:

At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against him for the money or property or to the effect specified in his offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer. The fact that an offer is made but not accepted does not preclude a subsequent offer. When the liability of one party to another has been determined by verdict or order or

judgment, but the amount or extent of the liability remains to be determined by further proceedings, the party adjudged liable may make an offer of judgment, which shall have the same effect as an offer made before trial if it is served within a reasonable time not less than 10 days prior to the commencement of hearings to determine the amount or extent of liability.

Rule 68 is obviously applicable to an offer of judgment by defendant but does not cover one by plaintiff. Defendant contends that this is why plaintiff, after the case was removed to federal court, nonetheless filed the offer under a state procedural statute so as to benefit from the coercive effect of the offer on costs. Firestone also argues (1) that *any* offer of settlement would be procedural and, therefore, in a diversity case, a matter for federal law under *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); and that where a state procedural rule and a federal rule conflict, the federal rule pre-empts; (2) that the offer was premature in any case, inasmuch as even Wisconsin law would require that the offeree have an adequate opportunity to consider the offer—and that this was not possible where Firestone had no knowledge of the claim prior to suit and the offer was made on December 17, 1981, two days after issue was joined; that this would violate the rudiments of fair play and due process under *Chicago and Northwestern R.R. v. Nye Schneider Fowler Co.*, 260 U.S. 35, 43 S.Ct. 55, 67 L.Ed. 115 (1922); (3) that the offer is fatally defective as to form in omitting reference to "costs"; and (4) that the very nature of punitive damages, being in the discretion of the jury, is such that an offer-of-judgment cannot be utilized in a case claiming punitive damages.

Plaintiff contends that a number of federal courts have ruled that statutes similar to § 807.01, Wis.Stats. are substantive and control the question of prejudgment interest in diversity cases. She argues that "In diversity actions, federal courts look to state law to determine whether prejudgment interest is allowable," and cites there-

fore *Reports Corp. v. Technical Publishing Co.,* 411 F.2d 168, 173 (7th Cir.1969), but that was a situation where a determinable amount was involved and where the issue was really whether prejudgment interest should be allowed under an Illinois statute that provided creditors should "be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due ... on money withheld by an *unreasonable and vexatious delay of payment*" (emphasis supplied). That is a far cry from the situation at bar where we are dealing with negligence and strict liability, not contract law, and where the claim for twelve percent (12%) prejudgment interest on an unliquidated injury claim is sought as part of a state offer-of-judgment statute two days after issue was joined. Nor was plaintiff's other source case, *Dempsey-Tegeler & Co. v. Irvin,* 415 F.2d 1348, 1351 (7th Cir.1969), any more persuasive.

As to the question of whether or not the offer was premature, plaintiff points to § 807.01 Wis.Stats. which, by its terms, provides that the offer of judgment is timely if served "after issue is joined, but at least 20 days before the trial." This is certainly true if the statute applies.

Regarding defendant's contention that to bind the defendant in this case would be contrary to the rudiments of fair play and due process, plaintiff argues that such argument ignores the nature of prejudgment interest and anyhow, the Wisconsin Legislature has spoken.

Further arguments exist between the parties as to whether or not the offer was procedurally defective under section 807.-01(3) because it fails to include "costs," and whether or not an offer of judgment can be based on punitive damages.

■ The Court has considered each of these arguments. It is convinced that each would make for interesting debate—but that the strongest argument, and that which is decisive in its mind is the doctrine that in diversity cases, the federal courts follow the substantive law of the appropriate state, but the procedural law of the federal forum. Despite plaintiff's efforts to wrap the effort with the cloak of substance, it is clearly procedural in nature and therefore, as presented, inappropriate in this case. This view is buttressed by Judge Reynold's recent decision in *Hutchison v. Burning Hills Steel Co., Inc.,* 559 F.Supp. 553 (E.D.Wis.1983). Accordingly defendant's motion to strike the plaintiff's Offer of Judgment is herewith GRANTED.

## PARTIAL SUMMARY JUDGMENT

Firestone brings a motion for partial summary judgment seeking to eliminate the punitive damage claims of the complaint. It might be termed a three-pronged attack, the segments of which the Court will address separately.

## I. SURVIVAL THEORY

Plaintiff's complaint speaks in a number of claims but in the ad damnum clause, seeks punitive damages of $3,500,000. Defendant's brief on its motion for partial summary judgment contends that the complaint in this case basically asserts a wrongful death claim under Wis.Stat. § 895.04 and that punitive damages cannot be recovered here because they cannot be recovered incident to damages for wrongful death under *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437 (1980), since the decedent never recovered consciousness. Defendant objects to what are called "conclusory allegations" elsewhere in the complaint that Klawes endured extreme pain and suffering entitling his estate to damages for personal injury under the Wisconsin survival statute, § 895.01. This pleading defendant denominates as "bootstrap" and seems to feel it is therefore defective.

■ While the complaint is not the clearest document imaginable, the Court must agree with plaintiff that, while the demand for punitive damages can't be made on a wrongful death claim, claims for personal injury do, under section 895.01, survive the death of the victim. This includes conscious pain and suffering. The very case cited by defendant for non-recovery under wrongful death also stands for the proposition that

claims for punitive damages incident to damages for pain and suffering pass to the decedent's estate. *Wangen, supra,* p. 311, 294 N.W.2d 437.

The premise of defendant's position requires that it be clear that Klawes had no pain and suffering because he was never conscious after the injury. Absent this foundational fact, defendant's first attack has no merit.

## II. CONSCIOUS PAIN AND SUFFERING

■ Defendant's second proposition would support his first argument if it should be established with certainty. But that is the second question. Does the information available to the Court on this motion (pleadings, depositions, answers to interrogatories, admissions and affidavits) show that there is no genuine issue as to whether Klawes ever regained consciousness.

■ Pain and suffering does not legally occur unless one is conscious. A victim who is rendered unconscious and never regains consciousness cannot be awarded damages for pain and suffering. *Schulz v. General Casualty Co.,* 233 Wis. 118, 288 N.W. 803 (1939). Such a result would wipe out the claim for punitive damages here.

In support of defendant's motion and its contention that Klawes was rendered unconscious when the rim exploded and remained so until his death, the medical records of Kenosha Memorial Hospital, including the Operative Record and the Nurses Notes, were submitted. These show that the patient was admitted to the hospital at 7:20 A.M., unconscious; that he was not responsive; had dilated, fixed pupils and was without any movement of arm or leg in response to painful stimuli. Dr. Gerol described Klawes as "deeply comatose." Operative procedures took until 9:30 A.M. The Nurses Notes again indicate no response to painful stimuli at 12:00 noon and at 2:00 P.M. He expired at 3:05 P.M.

The affidavit of Thomas Cyarnecki, one of the three members of the Rescue Squad who responded to the call recites:

6. Upon our arrival, Mr. Klawes was unresponsive to verbal, pain or other physical stimulus and was unconscious. The iris in his right eye was dilated. His airway was substantially obstructed with blood.

7. We inserted a suction device, consisting of a plastic tube connected to a vacuum, into Mr. Klawes' throat and mouth, attempting to clear blood and any foreign matter from his airway. We also inserted an oxygen tube through his mouth to the back of his tongue. Mr. Klawes did not gag or otherwise respond to any of this.

8. We transported Mr. Klawes, using red lights and siren, to Kenosha Memorial Hospital.

9. Rosera and I rode in the back of the ambulance caring for Mr. Klawes. Throughout transport, he remained unconscious and unchanged from his initial condition described above.

10. I continued to observe Mr. Klawes until and after the hospital staff directly took over the care of Mr. Klawes. His condition remained unchanged throughout my observation.

11. From the time of our arrival at Redway until sometime after the hospital staff actually took over care for Mr. Klawes, I remained with and directly observed Mr. Klawes. During that entire time, he continuously remained unconscious and unresponsive to verbal, pain and other physical stimulus.

Alan G. Broyles was a bystander who saw the accident and observed Klawes continuously until his departure in the ambulance. He swears that "during that entire time, Mr. Klawes remained unconscious, never made a sound, never responded physically or otherwise to any handling or to any talking by me or anyone else, and never changed in condition."

The only indications running contra are those in the affidavit of Janice Klawes, decedent's widow. She alleges that while

she was at her husband's bedside in the hospital, she spoke to him many times and that "her husband did squeeze her hand when she held it and when she spoke to him." She also alleges that she observed her husband's heartbeat on the monitoring equipment in the intensive care unit—and that his heartbeat would increase in response to her voice.

The indications that Mr. Klawes was instantly rendered unconscious and remained so until his death are very strong. The affidavit of the attendant's wife, in addition to being that of an untrained observer, was that of a loved one, in the grip of great emotions and whose fervent hope may well have fostered her observations. It also runs counter to the allegation of the complaint (Paragraph 16) that Klawes was "knocked unconscious . . ." Nonetheless, it does raise a factual issue that is vitally important to a number of the claims herein. The Court is mindful of the drastic nature of summary judgment and the admonition of the case law that if there is a genuine issue of fact, summary judgment should be denied even if the Court believes that movant will prevail at trial. *Hughes v. American Jarva, Inc.,* 529 F.2d 21, 25 (1976).

Therefore, defendant's motion for summary judgment of the "survival" claim of the estate will be denied with leave to raise the matter again should it become appropriate at trial.

### III.  ECONOMIC UTILITY

In its third attack upon the complaint, the defendant posits that as a matter of law punitive damages are not allowed where the injury results from the principal economically useful feature of the product. The complaint reveals that the apparatus which caused the injury here was "a split side ring, marked 20 × 7.5 FL to be used in conjunction with a Firestone 20 × 7.5 FL tire rim, in the assembly of a multi-piece truck tire rim." Defendant argues that the only "defect" asserted is that multi-piece rims come apart and that, since the ability to separate is the very reason that they are used on large trucks, the manufacturing

and distribution of such an economically useful product which can, under certain circumstances come apart explosively and cause injury cannot, as a matter of law, be such "outrageous" conduct as under the *Wangen* case would make punitive damages permissible. The affidavit of Robert E. Lee, Manager of Technical Services for Firestone, opines that multi-piece rims are required for tube-type tires and that more than seventy percent (70%) of all medium and heavy trucks in the United States are currently equipped with multi-piece rims. He further recites that multi-piece rims are preferred for hard trucking use because tube-type tires on multi-piece rims have much better air retention capability under stressful use. He does indicate that a single-piece truck rim technology has developed in the 1970's, along with the growth of tubeless truck tires, but it is clear that the multi-piece rims which comprise the overwhelming majority of the market are manufactured, sold, and preferred precisely because they do come apart and have the advantages which severability confers.

Defendants draw an analogy between multiple-piece rims which are very useful but very dangerous if improperly assembled and the sharp butcher knife; or the small economical car that is not very crashworthy. These are products which draw their utility from the same characteristic that makes them dangerous.

Defendant constructs its position from the text of *Wangen,* 97 Wis.2d 260, 294 N.W.2d 437 on p. 442–43 where the majority opinion seeks to give meaning to the "malice" which must be shown for punitive damages to be appropriate in addition to compensatory damages.

Any exact and precise definition of the technical term in law of the "malice" that must be shown in order that there may be a basis for punitory damages in addition to compensatory damages for a breach of some duty by a defendant when such is the proper subject of an action in tort, is hard to find and still harder to frame. It is evident, however, from all the authorities that in any particular case, not in and

of itself a malicious action, in order that punitory damages may be assessed something must be shown over and above the mere breach of duty for which compensatory damages can be given. That is, a showing of a bad intent deserving punishment or something in the nature of special ill will towards the person injured, or a wanton, deliberate disregard of the particular duty then being breached, or that which resembles gross as distinguished from ordinary negligence. [Quoted with approval in *Mid-Continent Refrigerator Co. v. Straka,* 47 Wis.2d 739, 747, 178 N.W.2d 28 (1970).]

Elsewhere in the opinion the term "outrageous" is used as the touchstone by which the propriety of punitive damages may be tested.

Defendant asks how the production of a product that is admittedly dangerous if misused but unquestionably useful and purchased by the public with full recognition of its dangers can be the basis for punitive damages. Arguing that it obviously should not be, the defendant points to the *Wangen* decision, 97 Wis.2d on p. 298, 294 N.W.2d 437 where the Wisconsin Supreme Court opined:

We are persuaded that punitive damages may play a role in product liability as is the role of all damages awards, to fit the context in which the particular case arises. *Judicial controls exist in this state for determining whether the imposition of punitive damages is appropriate in the particular case* and for determining the amount of the punitive damages award which will serve the punishment and deterrent objectives of punitive damages, without inflicting a penalty on a defendant disproportionate to the defendant's wrong and contrary to the public interest. *We believe the judicial controls, which we describe below, will provide for fair administration of punitive damage awards in this state.*

... In Wisconsin the trial judge initially determines whether the evidence establishes a proper case for the allowance of punitive damages and for the submission of the issue to the jury. *Meshane v.*

*Second Street Co.,* 197 Wis. 382, 386–87, 222 N.W. 320 (1928). *Unless there is evidence from which a jury could find that the wrongdoer's conduct was "outrageous," the trial court should not submit the issue of punitive damages to the jury. Mid-Continent Refrigerator Co. v. Straka,* 47 Wis.2d 739, 748, 178 N.W.2d 28 (1970); Ghiardi, *Personal Injury Damages* sec. 2.07 (Wis.Cont.Leg.Ed.J.1964).

97 Wis.2d at 298, 294 N.W.2d at 457 (emphasis added by defendants.) The case at bar is before the Court on diversity and, hence, under *Erie v. Thompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it must look to the products liability law of Wisconsin. *Wangen* is probably the latest and most authoritative expression of that law.

Defendant does not have much in the way of precedent to sustain its view. Defendant offers only two federal cases that discuss the matter. In *Dreisonstok v. Volkswagenwerk A.G.,* 489 F.2d 1066 (1974), the Fourth Circuit Court of Appeals was faced with a collision involving a Volkswagen microbus. Plaintiff was seated in the center of the bus, next to the driver and was severely injured. Plaintiff and her mother sued the car manufacturer for "enhanced" injuries. The design of the vehicle was such that the driver and occupants were seated up front over the engine (and without the protection of an engine and front end before them) so as to maximize the cargo and carrying capacity. This was the vehicle's prime sales feature. The case discusses the duty of defendants to create a "crashworthy" car, and in reversing the district court, held as a matter of law.

There was no evidence in the record that there was any practical way of improving the "crashability" of the vehicle that would have been consistent with the peculiar purposes of its design.

*Dreisonstok v. Volkswagenwerk A.G.,* supra, at 1074. But the case, while it may address the question of the duty of care that a manufacturer has when danger and utility collide, and whether one configura-

tion should have been chosen over another, it really doesn't provide much guidance in this situation. More helpful is *Dorsey v. Honda Motor Co., Ltd.,* 655 F.2d 650 (1981). There, a products liability action was brought against Honda by one Dorsey for serious injuries sustained in a crash with a heavier Ford. Dorsey bought the small, lightweight vehicle with knowledge that it might be severely damaged if hit by a heavier vehicle. Honda had made specific crashworthiness tests but, despite discouraging results and even an employee recommendation to increase size, nonetheless exported the car to the United States. Honda argued in post trial motions that punitive damages should not be available because liability in a products liability case is predicated on the nature of the product and not on the character of the defendant's actions whereas in assessing punitive damages, the character of the act is paramount. The district court ruled that, since the small size of the Honda (the very reason Dorsey bought and used it) was the essential feature that made it less crashworthy, punitive damages could not be allowed. The Fifth Circuit Court of Appeals reversed, finding that punishment and deterrence, a basis for punitive damages in Florida, were no less appropriate with respect to a products manufacturer who knowingly ignores safety deficiencies in its products that may endanger human life and held that Florida would permit an award of punitive damages on these facts where the jury had found Honda to have been wanton, willful, and recklessly indifferent with respect to the rights and safety of others.

In so finding, the court of appeals cited *Wangen, supra, Wussow v. Commercial Mechanisms, Inc.,* 97 Wis.2d 136, 293 N.W.2d 897 (1980), and Judge Gordon's decision in *Drake v. Wham-O-Manufacturing Co.,* 373 F.Supp. 608 (E.D.Wis.1974).

This Court is well aware that, in *Walbrun v. Berkel,* 433 F.Supp. 384 (E.D.Wis.1976), it granted a motion to strike allegations relating to punitive damages in a products liability case with a conclusion drawn from the language of *Bielski v. Schulze,* 16 Wis.2d 1, 114 N.W.2d 105 (1962) and *Kink v. Combs,* 28 Wis.2d 65, 135 N.W.2d 789 (1965). In doing so, the Court took a position in opposition to that of Judge Gordon in *Drake v. Wham-O-Manufacturing, supra,* and said:

> It therefore appears that punitive damages have been eliminated in Wisconsin except for those cases involving intentional torts ...

This split within the district was reviewed by Professors Ghiardi and Kircher in *Punitive Damages Law and Practice,* § 6.17 p. 63. They analyzed the different approaches therein in noting:

> It is clear that Judge Warren believes that a punitive damage claim is dependent not only upon the conduct of the defendant, but also upon the nature· of the underlying legal theory advanced by the plaintiff. As previously indicated, a punitive damage claim "piggy backs" upon an underlying cause of action, it has no independent basis for its assertion. The crucial issue then becomes whether this "piggy back" or "add on" of the punitive claim is contingent only upon a defendant's conduct (as Judge Gordon holds) or upon a defendant's conduct and the form of the plaintiff's underlying legal theory (as Judge Warren holds).

Of course *Walbrun* (1976) and *Drake* (1974) both predated *Wangen* (1980). This Court would note that the Wisconsin law with respect to punitive damages in product liability cases has been clarified a great deal in *Wangen* and that it is now clear that Wisconsin does focus on the conduct of defendant.

There may well be a valid distinction between this case and the butcher knife or the crashworthy car cases. There may be products where the essential utility of the product and the clarity of danger are such that no rational finding of "wanton" or "outrageous" conduct could be made. Maybe the manufacture of dynamite provides such an example; ·but, the Court opines, a multipiece truck rim is not.

Furthermore, while this Court agrees with defendant that *Wangen* instructs us that, in Wisconsin, the law of

punitive damages in product liability cases now is that the trial court should not submit the issue of punitive damages to the jury unless there is evidence from which the jury could find the wrongdoer's conduct was "outrageous," that does not mean that it should take the issue out of the case before it knows what the evidence on the nature of defendant's conduct is. Adequate controls of the sort required by *Wangen* exist at and after trial.

■ Finally, the *Erie* doctrine teaches us to apply the law of the forum state in diversity matters. Here there is a developing stub of Wisconsin law in *Wussow* and *Wangen,* but the forum's jurisprudence has not yet become so clearly delineated that it can be said with assurance that Wisconsin will not permit punitive damages in product liability cases where the feature which creates utility is also the cause of injury. In such a context it ill behooves a federal tribunal to make Wisconsin law for it. It is unbecoming for a federal forum to exert unnecessary control at a premature stage of the litigation where it can always be exerted subsequently should that become necessary to provide justice.

Accordingly, defendant's motion for partial summary judgment on the question of punitive damages is DENIED.

## PLAINTIFF'S MOTION TO COMPEL

On March 3, 1982, plaintiff served defendant with a set of sixty-four (64) interrogatories, to which defendant responded on April 7, 1982, answering five (5), and objecting to fifty-eight (58). The parties attempted settlement of their differences on April 27, 1982, but were unable to do so. Thereafter, making the certification required under Local Rule 6.02, plaintiff moved to compel answers. The parties have briefed the matter. Having considered the brief, the Court is of the view that the issues involved can best be resolved by oral argument and decision. Therefore, a notice is enclosed placing this matter on the calendar for disposition.

## DEFENDANT'S MOTION TO COMPEL

On April 7, 1982, defendant issued a notice of deposition for the taking of depositions of various investigative personnel, said notices were accompanied by a subpoena duces tecum reflecting documents defendant wished produced. Plaintiff resisted production. Counsel sought to settle their differences on April 27, 1982, but were unsuccessful and defendant filed a motion to compel production of statements, tests and other documents made or obtained by the decedent's employer's worker compensation carrier. The matter has been fully briefed.

The accident in question occurred on December 28, 1978. This action was filed by plaintiff on November 16, 1981, in Kenosha County Circuit Court. The affidavit of Holly A. Hamlin, a litigation paralegal with Firestone, avers that Firestone first received knowledge of this claim on November 23, 1981, about three years after the accident. The affidavit of Duane Minton, Senior Claims Representative for General Accident Group, the workmen's compensation carrier for Klawes' employer, alleges that he authorized an engineering investigation of the tire and rim involved "subsequent to the death of Allen D. Klawes on December 28, 1978," and that the purpose of the engineering investigation was "to evaluate a third party claim whereby General Accident Group might receive reimbursement for Worker Compensation payments...."

Rule 26(b)(3) Federal Rules of Civil Procedure excludes from the broad scope of discovery "documents and tangible things ... prepared in anticipation of litigation or for trial" by a party or agent. In the famous case of *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court established that the "general policy against invading the privacy of an attorney's course of preparation is so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order."

The requirement for a showing of necessity or justification before this privacy could be breached was incorporated into the Rules by 1970 Amendments. The rule reflects the thrust of the cases to require a special showing, not merely as to materials prepared by an attorney, but also as to materials prepared in anticipation of litigation or preparation for trial by or for a party or any representative acting on his behalf. So that by its wording the protection extends to a variety of non-attorneys unless there is the special showing. *Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 487 F.2d 480 (1973).

The Notice of Deposition for Thomas Dzibenski, Branch Manager, Crawford & Company Insurance Adjusters, Inc. called for the production of almost any kind of document imaginable relating to the accident, but the briefs of the parties seem to indicate that there are statements of various witnesses obtained shortly after the event and also "tests, examinations or inspections" of the truck tire rim involved.

On the issue of whether these materials were prepared in anticipation of litigation so as to be protected under *Hickman,* both sides dissect *Fort Howard Paper Co. v. Affiliated F.M. Insurance,* 64 F.R.D. 694 (E.D. Wis.1974). There the roof of a building collapsed. A recorded interview was taken six months later from the supervising engineer at the site. Production was resisted under attorney-client privilege and the "work product" exception to the general discovery permitted under Rule 26(b)(1) Federal Rules of Civil Procedure. Judge Gordon found the attorney-client privilege inapplicable and also found no protection under the work-product doctrine. Plaintiff here can draw little support from the decision although it is true the work-product issue is not directly discussed.

Plaintiff discusses three differing approaches to this question of when materials are prepared in anticipation of litigation. *Thomas Organ Co. v. Jadranska Slobodna Plovidba,* 54 F.R.D. 367 (N.D.Ill.1972) requires attorney participation. *Westhemeco Ltd. v. New Hampshire Ins. Co.,* 82 F.R.D.

702 (S.D.N.Y.1979) rejected a hard and fast rule but generally adopts a highly protective stance. Plaintiff and defendant both would apply the middle-of-the-road yardstick of *Miles v. Bell Helicopter Co.,* 385 F.Supp. 1029 (N.D.Ga.1974) to the facts here. Miles would hold that, for the material to be protected:

The probability must be substantial and the commencement of litigation must be imminent.

■ Here the Court considers the *witness statements* procured by General Accident to have been the normal kind of investigation the compensation carrier would routinely make and not immune from general discovery.

■ The *engineering tests, examinations* or *inspections* the Court finds to be a closer case. The Minton affidavit asserts that such efforts were not routine but were undertaken for the purpose of "evaluating its ability to recover those workmen's compensation payments." Minton further alleges that this was the only time in fifteen years of employment that he had ever authorized such an investigation.

However, it is also true that elsewhere Minton says the purpose of the engineering investigation was "to evaluate a third party claim whereby General Accident Group might receive reimbursement for Worker Compensation payments made on behalf of the decedent, Allen D. Klawes." This on a claim that was not assigned out for legal action until two to three years later.

As the Court quivers on the knife edge of decision as to the *purpose* of General Accident's activity, it is impelled to a decision by taking a look at the *need* aspects of the test. The accident and death occurred on December 28, 1978—nearly five years ago. Plaintiff has the benefits of a thorough investigation by General Accident more or less contemporaneous with the accident. Defendant's documents establish (Hamlin Affidavit, ¶ 3) that its first notice of this claim was after the Summons and Complaint was filed November 16, 1981. At this point, the trail was indeed cold. State-

ments of witnesses regarding the accident could not begin to be as accurate as when the facts were fresh. Even the observations of learned observers or experts of tests conducted on the rim would probably be affected by the time factor. Further, when it is considered that to protect such documents now would not only frustrate the "search for truth" espoused in *McDougall v. Dunn*, 468 F.2d 468 (4th Cir.1972), but also reward delay in instituting action, this Court concludes that it should follow *Fort Howard, supra,* and does herewith GRANT defendant's motion to compel.