Carie M. PALMER, Plaintiff-Appellee,

v.

A.H. ROBINS CO., INC., a Virginia corporation, Defendant-Appellant.

No. 81SA149.

Supreme Court of Colorado,
En Banc.

June 4, 1984.

As Modified on Denial of Rehearing
June 18, 1984.

Bragg & Dubofsky, P.C., Douglas E. Bragg, John T. Baker, Denver, for plaintiff-appellee.

Tilly and Graves, James L. Tilly, Charles Q. Socha, Denver, McGuire, Woods & Bat-

tle, Alexander H. Slaughter, E. Duncan Getchell, Jr., Mays, Valentine, Davenport & Moore, William R. Cogar, Clifford W. Perrin, Stephen W. Brewer, Richmond, Va., for defendant-appellant.

QUINN, Justice.

In this appeal the defendant-appellant, A.H. Robins Company, Inc. (Robins), challenges a judgment for compensatory and punitive damages in favor of the plaintiff-appellee, Carie Palmer. Robins raises a multitude of claims relating to several evidentiary rulings of the trial court, the sufficiency of evidence on Palmer's negligence claim, the submission to the jury of Palmer's claims for breach of express and implied warranties, the propriety of certain jury instructions on the burden of proof and negligence per se, and, in addition, the jury's award of punitive damages. Finding no reversible error, we affirm the judgment.

I. *The District Court Proceedings*

In order to place this case in a factual context, we briefly summarize the events leading up to the judgment. Occupying a central role in these events is the product itself, the Dalkon Shield (shield).

The shield is a plastic intrauterine device manufactured by Robins. It is small and oval shaped, about the size of a dime, with a row of fins or prongs on each side. It is designed to fit the shape and contour of the uterine cavity. A tailstring is attached to the shield as an aid in checking for proper placement and as an aid to its removal. When the shield is properly in place, the tailstring passes forward from the uterus through the cervix and into the vagina. The string, unlike the single strand employed in other intrauterine devices, is a multifilament strand placed inside a nylon sheath unsealed at both ends.

The shield was invented in 1968 by Irwin S. Lerner, who modified a previous design by Dr. Hugh J. Davis, an associate professor of obstetrics and gynecology at Johns Hopkins University. Lerner, Davis, and one other individual subsequently formed the Dalkon Corporation to market the shield. Beginning in September 1968, Davis conducted a test study for one year on the shield at a family planning clinic that he directed. According to Davis, 640 insertions resulted in only five pregnancies, the biostatistical equivalent of a 1.1% rate during the testing period. Without referring to his financial interest in the shield, Davis then published an article in the February 1970 issue of *American Journal of Obstetrics and Gynecology,* in which he reported on the results of the study and repeatedly referred to the shield as a "superior" IUD.

Robins, intrigued by Davis' test results, investigated the possibility of purchasing the shield. As a result of this investigation, two memoranda were sent to Robins' top management in early June 1970 by members of Robins' medical department. The first memorandum, authored by Dr. Fred Clark, indicated that Davis' claim of a 1.1% pregnancy rate in twelve months had jumped to the equivalent of a 5.5% pregnancy rate after fourteen months. A second memorandum, written by Dr. Jack Freund, in addition to noting that the 1.1% pregnancy rate of the Davis study had undergone some increase with a longer follow-up period, stated that the Davis study was "not long enough ... to project with confidence to the population as a whole." The existence and contents of these memoranda were never revealed to those Robins' personnel responsible for marketing the shield. On June 12, 1970, Robins purchased all rights to the shield from the Dalkon Corporation.

Robins made several modifications to the shield in late 1970. Without completing any clinical testing on the modifications or revealing them to the medical profession, Robins began to market the shield nationally in January 1971, carrying out an extensive promotional campaign directed to both the medical community and the lay public. Robins' product label is particularly indicative of the type of claims made about the device, namely: that the shield was "the modern superior I.U.D."; that it had the "lowest pregnancy rate [of] 1.1%"; that it "combin[ed] minimal pregnancy rates with

exceptional patient tolerance"; that it "prevent[ed] pregnancy without producing any general effects on the body, blood or brain"; and that it "provid[ed] safe, sure, sensible contraception." The primary basis for these claims was the Davis study in 1968–69 prior to the modification of the shield in 1970.

In August 1971 Robins was informed that the quality control supervisor at Chapstick, a Robins subsidiary which assembled the shield, had performed a "wicking" test on the tailstring of the shield and determined that the interior of the string could "wick" fluid through its entire length. The existence of a wicking tendency in an intrauterine device is significant in that the uterus is normally sterile. Under ordinary conditions the cervix and cervical mucus will prevent the entry into the uterus of bacteria residing in the vagina. However, an IUD tailstring with a wicking tendency can provide a pathway for vaginal bacteria into the uterus, thereby causing infection. The director of pharmaceutical research for Robins, although aware that the tailstring could thus transmit body fluids containing bacteria into the sterile uterus and cause infection, nonetheless instructed Chapstick that no changes should be made in the product.

On June 23, 1972, Dr. Thad J. Earl, a Robins clinical investigator and consultant, sent a letter to the management of Robins in which he warned of the danger of septic abortion in shield users who might become pregnant. Dr. Earl stated in his letter:

"The next situation I have found is with women becoming pregnant and if the Shield is left in place the women abort at 3½ to 5 months and become septic. I am advising physicians that the device should be removed as soon as a diagnosis of pregnancy is made. Numerous physicians have noted this. In my six pregnancies, I removed one and she carried full term, the rest all aborted and became septic. I therefore feel that it is hazardous to leave the device in and I advised that it be removed."

Robins did not contact Dr. Earl about this warning until after the shield had been removed from the market over two years later. During the seventeen month period between June 1972 and November 1973, when the plaintiff sustained grave injuries resulting from the use of the shield, Robins received twenty-two reports of spontaneous septic abortions in shield users, one of which resulted in death. Despite Robins' knowledge of the septic abortion danger, it it did not immediately alert the medical community to the danger. In October 1972 Robins revised its patient brochure, stating that if a woman becomes pregnant while wearing a shield, "the bag of water pushes the IUD to one side and the developing baby is not really touching the device at all. There is no evidence that the frequency of abnormal births is any greater among women wearing IUDs than among women not wearing IUDs." Also, as late as April 1973 Robins continued to advise physicians to leave the shield in place in the event the user became pregnant and desired the pregnancy to go to term.

On January 16, 1973, Carie Palmer, who was then a twenty-four year old wife and mother, was fitted by her obstetrician-gynecologist, Dr. Kenneth Petri, with a shield. Palmer, who wanted to wait several years before having more children, chose this device as a birth control method on the advice of Dr. Petri and on the basis of Robins' promotional materials describing the superior contraceptive and safety features of the shield. Dr. Petri had specifically relied on promotional claims made by Robins as to the safety and effectiveness of the shield in prescribing this device. After having been fitted with the shield, Palmer continued to use it as a method of contraception because, based on her review of Robins' promotional literature given to her by Dr. Petri, she believed the shield to be 98.9% effective in preventing pregnancy and safer than the birth control pill.

In August 1973 Palmer became pregnant. Dr. Petri, believing that removal of the shield might cause a spontaneous abortion, whereas leaving it in place could cause no harm, did not remove the device. Palm-

er's pregnancy progressed normally until November 18, 1973, when she became violently ill with influenza-like symptoms. Within hours of her admission into the hospital, she suffered a spontaneous septic abortion, an involuntary miscarriage caused by a blood borne bacterial infection centered in the uterine area. Palmer subsequently went into septic shock, a condition resulting from a massive infection with a concomitant fall in blood pressure to a dangerously low level. She also developed a blood disorder which impeded natural blood clotting ability. In order to save her life, it was necessary to perform a total hysterectomy in which her uterus, fallopian tubes and ovaries were removed. It was Dr. Petri's expert opinion that Palmer's uterine infection and the septic abortion were caused by the shield. As a result of the hysterectomy, Palmer experienced continued health problems thereafter.

In the fall of 1973 Robins had become aware that Dr. C.D. Christian, a professor of obstetrics and gynecology at the University of Arizona, was writing an article on the danger of mid-trimester septic abortions posed by IUDs, particularly the shield. Subsequently, in February 1974, Robins called a conference to examine the problem. The conference led to the issuance of a "Dear Doctor letter," dated May 8, 1974, to 120,000 doctors throughout the United States, warning them of the hazards associated with the shield in cases of unplanned pregnancies and concluding as follows:

> "We intend to explore every reasonable approach to determine if any unique relationship exists between the Dalkon Shield and septic abortion. In this connection, we request that you provide full details of any case of septic spontaneous abortion which may have occurred among your patients fitted with any IUD; such information may be sent to us or to the Bureau of Medical Devices and Diagnostic Products, Food and Drug Administration, Department of Health, Education and Welfare...."

Robins ultimately took the shield off the market in June 1974 at the request of the Food and Drug Administration.

Palmer, after being informed that her uterine infection had been caused by the introduction of bacteria into her uterus by means of the tailstring on the shield, filed suit against Robins in December 1975. The action was based on claims in negligence, strict liability in tort under section 402A of the *Restatement (Second) of Torts* (1965), and breach of express and implied warranties, with an added claim for punitive damages. Numerous pretrial hearings were held in an effort to resolve evidentiary issues and expedite the trial. The trial commenced on May 29, 1979, approximately six months prior to the effective date of the Colorado Rules of Evidence, lasted seven weeks, and involved a multitude of witnesses and hundreds of exhibits.

During the trial the court made various evidentiary rulings now challenged by Robins. The court ruled that certain "adverse reaction reports," which consisted of reports received by Robins of serious difficulties experienced by persons fitted with the shield, would be admitted on the issue of notice to Robins of the danger posed by its product. The court also admitted into evidence computerized records that had been made by Robins from reports it received of spontaneous septic abortions experienced by women using an IUD. Another challenged evidentiary ruling relates to the admission of Dr. C.D. Christian's article, "Maternal Deaths Associated with an Intrauterine Device." The court also admitted evidence of Robins' extensive "lay publicity" campaign to promote sales of the shield. Finally, the trial court, sustaining a hearsay objection by Palmer, refused to admit portions of a memorandum, written by a Robins project coordinator, summarizing portions of her telephone conversation with a physician who had reported a septic abortion suffered by a shield user.

It was established at trial that Robins' sales revenues from the shield exceeded $11,000,000 and that during the years it marketed this product its net worth nearly

doubled, increasing to $157,695,000 in 1974. Robins' net earnings were $25,360,000 in 1973, $26,917,000 in 1974, and $29,916,000 in 1978, the year preceding the trial, with a net worth of $240,275,000 at that time.

At the close of the evidence the court denied Robins' motions for directed verdicts on Palmer's liability claims and her claim for punitive damages. The court submitted instructions to the jury relating to Palmer's claims in negligence, strict liability in tort, and breach of an express warranty and implied warranties of merchantability and fitness for a particular purpose. In connection with the punitive damages claim, the court instructed the jury that punitive damages could be awarded if the jury found in favor of Palmer on either her negligence claim or defective product claim in tort and further found beyond a reasonable doubt "that the injury complained of was attended by circumstances of fraud, or by a wanton and reckless disregard of the rights and feelings of the plaintiff."

After three days of deliberations the jury returned verdicts in favor of Palmer for $600,000 compensatory and $6,200,000 punitive damages. The trial court denied post-trial motions and entered a judgment on the verdicts.

Robins appealed the judgment to the court of appeals, which referred the case to this court pursuant to section 13–4–102(1)(b), 6 C.R.S. (1973), because of Robins' challenge to the constitutionality of the punitive damages statute, section 13–21–102, 6 C.R.S. (1973). We accepted jurisdiction and address in this opinion all claims, constitutional and otherwise, raised by Robins. We first consider the evidentiary rulings of the trial court, next the issues relating to the warranty claims, then Robins' challenge to the sufficiency of evidence on Palmer's negligence claim, followed by the propriety of instructions on negligence per se and the burden of proof, and, last, Robins' claims respecting the punitive damages award. Additional facts as helpful to an understanding of particular issues will be set forth when those matters are addressed.

## II. Evidentiary Issues

### A. Adverse Reaction Reports

Robins challenges the admission into evidence of reported adverse reactions suffered by other users of the shield prior to November 18, 1973, when Palmer suffered the septic abortion. The trial court admitted the reports only on the issue of notice because, in its view, "the defendant had received notice through these various case reports of product defects and ... both under the negligence theory and under the product defect theory ... plaintiff may use this evidence to establish a failure to warn based upon notice that was given to the defendant of the alleged product defects." We conclude that the trial court did not err in its ruling.

■ The adverse reaction reports had been compiled by Robins in the normal course of its business in order to evaluate the medical significance of comments it received concerning its product. Most of the reports admitted into evidence consisted of letters and telephone memoranda from physicians reporting various problems associated with the use of the shield, including such conditions as septic abortions, unplanned pregnancies, uterine perforations, and infections. This evidence, although consisting of third party statements to Robins, was not subject to the hearsay rule of exclusion because it was "offered for some purpose other than proving the truth of the thing asserted." *Prudential Co. v. Sommers*, 148 Colo. 212, 221, 365 P.2d 544, 549 (1961).

■ When a manufacturer or seller knows or should know of unreasonable dangers associated with the use of its product and not obvious to product users, it has a duty to warn of these dangers; and a breach of this duty constitutes negligence. *E.g., Bailey v. Montgomery Ward & Co., Inc.*, 635 P.2d 899 (Colo.App.1981); *Hamilton v. Hardy*, 37 Colo.App. 375, 549 P.2d 1099 (1976); *see also Basko v. Sterling Drug, Inc.*, 416 F.2d 417 (2d Cir.1969);

*Howard v. Avon Products, Inc.,* 155 Colo. 444, 395 P.2d 1007 (1964); *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522 (1974). In addition, a manufacturer or seller may be strictly liable to users of a product when the failure to provide adequate warnings renders the product defective and unreasonably dangerous. *E.g., Anderson v. Heron Engineering Co., Inc.,* 198 Colo. 391, 604 P.2d 674 (1979) (per curiam); *Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276 (1978); *Hiigel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983 (1975); *Hamilton,* 37 Colo. App. 375, 549 P.2d 1099; *see generally* Annot., *Failure to Warn as Basis of Liability Under Doctrine of Strict Liability in Tort,* 53 A.L.R.3d 239 (1973). The adverse reaction reports constituted legally relevant evidence on the issue of notice to Robins of the potentially dangerous character of the shield. Robins' knowledge of reported adverse consequences from the use of the shield was a significant component of Palmer's claim that, by failing to eliminate these dangers or to give warning of them, Robins prevented her and her physician from making an informed decision on the use of the shield as a contraceptive device. The adverse reaction reports rendered the existence of notice of a dangerous or defective product more probable with the evidence than without it. *See Bush v. Jackson,* 191 Colo. 249, 552 P.2d 509 (1976).

Although the adverse reaction reports included references to untoward consequences other than septic abortions, the nature of these other reported incidents did not impair the legal relevancy of the evidence. These other incidents were probative of notice to Robins that something might well be amiss with its product. Appellate review of a relevancy decision such as this is limited because "we must assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *People v. Lowe,* 660 P.2d 1261, 1264 (Colo.1983). It was within the special province of the trial court to determine whether the probative value of

these reports was substantially outweighed by the danger of unfair prejudice, confusion, or the likelihood of misleading the jury. *Id.* at 1261. We find no abuse of discretion on the part of the trial court in admitting the adverse reaction reports.

### B. *Robins' Computer Records—Exhibit 559*

Relying on the hearsay rule of exclusion, Robins challenges the admission into evidence of an extensive computer printout (Exhibit 559) of reports compiled by Robins of septic abortions experienced by IUD users since the marketing of the shield in 1971. These reports were kept and recorded in Robins' files by Dr. Ellen Preston as part of her regular duties as Robins' product monitor for the shield. Exhibit 559, as acknowledged by Robins, was prepared by its staff and with the assistance of a physician who served as a paid consultant to the company. The exhibit contained a statistical compilation of reported septic abortions, subsequent to the marketing of the shield in 1971, that were associated with the use of the shield or other type of IUD. Exhibit 559 correlated the reported septic abortions with the type of IUD used by the patient and set forth the source and date of the report, together in most instances with the patient's name and the date and location of the incident. Robins collected this data principally from physicians, many of whom were responding to the company's "Dear Doctor letter" sent out in May 1974. In some instances the source of the report was a governmental health official, usually a physician, working for the Food and Drug Administration or the Center for Disease Control. In other instances the sources of information were persons other than a physician, such as a Robins representative in contact with various physicians, or the woman who suffered a septic abortion, her spouse, an attorney or other person acting on her behalf. The computer records showed that 304 incidents of septic abortion were reported to Robins, all but a few of them occurring in the United States. 257 or 85% of the reported septic abortions

involved women using the shield, 39 or 12½ % involved some other IUD, and in 8 or 2½ % of the reported incidents the type of IUD was unknown.

The trial court considered the admission of Exhibit 559 at an in camera hearing. At the hearing Palmer argued, *inter alia*, that the exhibit qualified as a business record of Robins and, in addition, satisfied the essential criteria of trustworthiness and necessity applicable to traditional hearsay exceptions. Robins, although expressly stating that it was an authentic Robins document and that "[i]t is trustworthy," contended that Palmer had failed to lay a proper foundation satisfying the business records exception. The court was satisfied that Robins had compiled the document in connection with its business and ruled that the document qualified as a business record. The court, however, limited the admissibility of the exhibit to the issue of notice with respect to septic abortions predating Palmer's injuries and, also, to the statistical significance of all entries in the exhibit to the issue of defect and causation, and so instructed the jury.

We are satisfied that the exhibit qualified for admission under two hearsay exceptions that were applicable to the trial of this case. Because the trial court's limiting instruction unduly restricted the incidents of septic abortion predating November 18, 1973, to the issue of notice, rather than admitting the entire exhibit on the substantive issues of defect and causation, any error in this respect worked to the benefit of Robins and cannot be deemed prejudicial.

1. *The Business Records Exception.* At the time of the 1979 trial in this case, the Colorado Rules of Evidence had not yet become effective and Colorado had no business records statute. The admissibility of the computer printout, therefore, must be resolved under controlling case law.

The early common law posed rigid foundation requirements for the admission of evidence under the business records exception. The proponent of the record was required to show: (1) an original entry; (2) made in the regular course of business; (3) reasonably contemporaneous with the event recorded; (4) the unavailability of the entrant; and (5) the entrant's personal knowledge of the event recorded. *See* Note, *Business Records as Evidence in Colorado*, 35 U.Colo.L.Rev. 221, 223 (1963). Colorado case law, however, has taken a less technical approach to the business records exception. *See generally People v. Stribel*, 199 Colo. 377, 609 P.2d 113 (1980); *Empire Diesel, Inc. v. Brown*, 146 Colo. 477, 361 P.2d 964 (1961); *Rocky Mountain Beverage, Inc. v. Walter Brewing Co.*, 107 Colo. 63, 108 P.2d 885 (1940); *Powell v. Brady*, 30 Colo.App. 406, 496 P.2d 328 (1972), *aff'd on other grounds sub nom. Brady v. Denver*, 181 Colo. 218, 508 P.2d 1254 (1973).

■ The business records exception, like other hearsay exceptions, is predicated on considerations of trustworthiness and necessity. It may reasonably be assumed that a business will accurately record information essential to its function in the marketplace. As Judge Learned Hand noted years ago in *Massachusetts Bonding and Insurance Co. v. Norwich Pharmacal Co.*, 18 F.2d 934, 937 (2d Cir.1927):

"The routine of modern affairs, mercantile, financial and industrial, is conducted with so extreme a division of labor that the transactions cannot be proved at first hand without the concurrence of persons, each of whom can contribute no more than a slight part, and that part not dependent on his memory of the event. Records, and records alone, are their adequate repository, and are in practice accepted as accurate upon the faith of the routine itself, and of the self-consistency of their contents. Unless they can be used in court without the task of calling those who at all stages had a part in the transactions recorded, nobody need ever pay a debt, if only his creditor does a large enough business. That there should not be checks and assurances of veracity we do not suggest; it is indeed possible to expose adversaries to genuine danger, but to continue a system of

rules, originally designed to relieve small shopkeepers from their incompetence as witnesses, into present day transactions is to cook the egg by burning down the house...."

In the case of computerized business records, which are frequently prepared by a business on the basis of information transmitted from numerous sources, practical considerations of trustworthiness and necessity come to the fore. The circumstantial probability of trustworthiness lies in the fact that these records will usually be made with a sufficient degree of care and accuracy as will permit them to be relied upon for commercial purposes. The necessity principle is equally present, namely, the inconvenience, if not impossibility, of summoning each individual whose information has been entered in the final record. With these considerations in mind, courts have held that computer generated business records will qualify for the business record exception when supported by an adequate foundation showing that: (1) the computer entries were made by a business in the regular course of its business; (2) those participating in the record making were acting in the routine of business; (3) the input procedures were accurate; (4) the entries were made within a reasonable time after the occurrence; and (5) the information was transmitted by a reliable person with knowledge of the event reported. *See, e.g., King v. State ex rel. Murdock Acceptance Corp.,* 222 So.2d 393 (Miss. 1969); *Transport Indemnity Co. v. Seib,* 178 Neb. 253, 132 N.W.2d 871 (1965); *Monarch Federal Savings & Loan Ass'n v. Genser,* 156 N.J.Super. 107, 383 A.2d 475 (1977); *see also United States Fidelity and Guaranty Co. v. Young Life Campaign, Inc.,* 42 Colo.App. 298, 600 P.2d 79 (1979).

In this case the computer records were kept by Robins as part of its regular course of business in monitoring the effects of its own product, a prescription device that it had placed on the market. *See generally* Rheingold, *Products Liability—The Ethical Drug Manufacturer's Liability,* 18 Rutgers L.Rev. 947 (1964). Robins' project coordinator for the shield and a Robins consultant gathered certain information related to its product, and so far as the record shows, this information was accurately entered when received. Although the entries related to septic abortions occurring since the marketing of the shield in 1971, this was the very type of data sought by Robins, as evidenced in its "Dear Doctor letter" of May 1974. What stands out as particularly significant to the reliability of the exhibit is the source of information for the entries. Of the 304 incidents of septic abortion associated with an IUD, 273 or 90% were reported by physicians (M.D.s or D.O.s), and the other 10% by non-physician federal health officials, the victims, the victim's lawyer, or other persons acting on the victim's behalf. The professional obligation of physicians to report serious health hazards associated with a widely used prescription device is, in our view, as equally compelling as any business duty to report especially where, as here, the business entity solicited this very type of data from the medical profession.[1] Moreover, physicians by training and experience would be the most reliable source of information on whether a septic abortion did occur and what particular type of IUD was in place at that time. The fact that a small percentage of entries originated from other sources does not impair the overall reliability of the exhibit. Also, it must not be overlooked that Robins conceded the trustworthiness of the records under consideration. This concession would not have been made if Robins, as a record keeper, harbored any doubt about the overall reliability of the data it had sought and collected.

---

1. Equally significant to the reporting factor is that, as we hold in Part IIIA *infra,* section 4–2–607(3)(a) of the Uniform Commercial Code contemplates that a physician who charges a fee for prescribing and inserting an IUD will report any warranty defect to the seller. Thus, in the case of septic abortions involving the shield itself, a physician who prescribed that device would have a significant legal interest in reporting the incident to Robins, the manufacturer-seller of the product.

Finally, we point out that the records in question were offered and received against the party preparing them. We are thus not dealing with self-serving information prepared by a party in anticipation of litigation. *See Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

■ Under the state of the record before us, we are satisfied that the computer records qualified under the common law hearsay exception for business records and, if anything, should not have been subject to a limiting instruction by the court. Having been received into evidence as business records, the records should have been admitted for the truth of the matters asserted therein as relevant to the issues of the case.

2. *The General Hearsay Exception.* At the time of the trial of this case, Colorado case law recognized a general hearsay exception based on practical considerations of trustworthiness and necessity. In *Good v. A.B. Chance Co.*, 39 Colo.App. 70, 80–81, 565 P.2d 217, 225 (1977), the court of appeals, considering the admissibility in a wrongful death action of an economist's opinion on inflationary trends based on statistics contained in publications of various governmental agencies, stated:

"An exception to the hearsay rule is warranted where the proffered evidence is trustworthy, as here, and necessity compels its admission.... The time spans encompassed by these statistics were lengthy, and the sources from which they were gathered are numerous and broad-based, making direct testimony from persons with first-hand knowledge of the writings from which the figures were extracted, a practical impossibility.... In addition, such information, even if obtainable, could not possibly have enlightened or assisted the jury in weighing the expert's testimony."

This rationale was later followed in *Colorado Aviation, Inc. v. Murphy*, 41 Colo.App. 237, 588 P.2d 877 (1978), and *People v. Romero*, 42 Colo.App. 20, 593 P.2d 365 (1978). *See also* 5 J. Wigmore, *Evidence* §§ 1421–1422 at 253–54 (Chadbourn rev. 1974).

■ The computer records possess all the characteristics essential for admission under the general hearsay exception previously sanctioned by Colorado case law. The exhibit contains sufficient guarantees of trustworthiness, having been prepared under Robins' direction in order to determine the dangerous effects of its own product that it had placed on the market. The reliability of the sources of the information cannot seriously be questioned, and as previously noted, Robins expressly conceded the trustworthiness of the exhibit. Finally, the admission of the information in the tabulated and summarized form was the only practical way to present this evidence to the jury. The difficulties associated with calling each and every source of 304 reports of septic abortions involving IUDs would have been insurmountable. We therefore conclude that the trial court did not err in admitting Exhibit 559 under the general hearsay exception then in existence.

C. *Dr. Christian's Article—Exhibit 56*

Robins asserts that the trial court erred in admitting into evidence, over its hearsay objection, an article published by Dr. Christian in 1974 in the *American Journal of Obstetrics and Gynecology* and entitled "Maternal Deaths Associated with an Intrauterine Device." This article described case histories of twelve pregnant women who had been fitted with IUDs prior to their pregnancy and had either died as a result of massive uterine infection or suffered septic abortions during their pregnancies. Dr. Christian stated in the article that the case studies were not completely detailed due to a sense of urgency on his part to express his concern about the possible problems associated with the design characteristics of the shield. In five of the case studies Dr. Christian personally consulted the patients and in the other seven he reviewed hospital records or conferred with the attending physicians. The article

drew no hard and fast conclusions, but expressed the following concerns:

"One wonders if there may be something about the design of the shield-type device that allows vascular dissemination of infection that might otherwise be locally contained. In this regard, it is easy to visualize that the pronglike protrusions on the periphery of the device could make this apparent difference in the incidence of such problems when .compared to the smooth-surfaced devices. Such conjecture is just that, and certainly no experimental data exists to say that any particular design is more or less likely to be associated with dissemination of infection.

"This all invites the much larger question of whether there should be more rigid evaluation and control of medical devices. Certainly, if there were five botulism deaths from one type of mushroom soup, the Food and Drug Administration would do more than put out a questionnaire.

"Any pregnancy associated with an intrauterine device must be followed most circumspectly, and we must be constantly alert to the slightest symptom or complaint. Painless dark brown spotting is common to most of the reported cases, but symptoms as apparently unrelated as sore throat, painful ear, or flu heralded the fatal sepsis in certain of the patients."

Robins did not object to the admission of the article insofar as it related to the five cases of which Dr. Christian had personal knowledge, but claimed that all references to the other seven cases were inadmissible hearsay.

■ The trial court, ruling that the report was based upon reliable sources, overruled the objection and admitted the article. Although the particular purpose for admitting the article was not articulated by the court, it apparently was admitted as a basis for the expert opinion testimony that plaintiff's counsel intended to elicit from Dr. Christian.[2] We conclude that, while the trial court should have admitted the exhibit only for the limited purpose of serving as a basis for Dr. Christian's expert opinion testimony, the admission of the article without a limiting instruction was not reversible error under the particular circumstances of this case.

We have held in the past that expert witnesses may testify to information received from others upon which they rely in reaching their opinions. *E.g., Houser v. Eckhardt,* 168 Colo. 226, 450 P.2d 664 (1969). This is simply a recognition of the fact that expert opinions "are the product of a judgmental process which combines education, training, experience, and hearsay information to arrive at an intelligent reasoned conclusion." *DURA v. Berglund-Cherne,* 193 Colo. 562, 568, 568 P.2d 478, 482 (1977). When third party assertions are received for the purpose of serving as the basis for an expert opinion, the assertions are not evidence of the matters presented, but merely explanatory of the opinion itself, thus enabling the jury to weigh the opinion in light of its basis. *Houser,* 168 Colo. 226, 450 P.2d 664; *McCormick on Evidence* § 15 at 34–36 (2d ed.1972).

Dr. Christian, who was received as an expert witness in obstetrics and gynecology, described the content of his 1974 article and also described professional literature

**2.** The trial court in its ruling analyzed the admissibility issue in terms of both the permissible data on which an expert could properly rely in offering opinion testimony and the hearsay nature of the article. It then concluded:

"But, it would be my understanding that as long as the type of hearsay that's relied on is reliable, in the sense of reliability for the particular opinion being given—and here, apparently, he is expressing observation of a problem with IUDs, not only just with the Dalkon Shield but with other IUDs—that the nature of the article is to raise questions about a purported problem. And I haven't—I have seen the article and read it before, but I don't remember all the details of it now. But from what the doctor has described in the article, the Court would find that the material that went into the article is reasonably reliable and that I will allow the article into evidence and he may testify about the facts set forth in the article."

read by him on the phenomenon of septic abortions and various internal documents of Robins reviewed by him, including the computer records (Exhibit 559) which had previously been admitted into evidence. All this testimony was offered as a foundation for various opinions elicited from Dr. Christian including the following: that the tailstring and the phalange-like projections of the shield contributed to the high incidence of septic abortion; that, based on his review of Palmer's hospital records, she did suffer a septic abortion on November 18, 1973; and that the cause of Palmer's septic abortion was the IUD that had been previously inserted and was still in place on November 18, 1973. Thus, it is clear from a review of the entire record that the only evidentiary function served by Dr. Christian's article was to present an adequate foundation for the ultimate opinions expressed by him on the witness stand.

Although the trial court should have instructed the jury that the article was admitted for the limited purpose of serving as one of the underlying bases for Dr. Christian's opinions, no such instruction was requested by defense counsel. Moreover, a review of the computer records (Exhibit 559), which had been admitted into evidence prior to Dr. Christian's testimony, discloses that most, if not all, of the incidents reported in Dr. Christian's article and described by him in his testimony had been included in the Robins' computer tabulation. The failure to give a limiting instruction on evidence which previously had been admitted and indeed was properly admissible as substantive evidence of the truth of the matters asserted could not possibly have affected the substantial rights of the defendant in this case, particularly when no such limiting instruction was ever requested by the defendant. Any error in this respect, therefore, must be deemed harmless under C.A.R. 35(e).

D. *Robins' Lay Publicity Campaign*

Robins argues that the trial court erred in overruling its relevancy objection to evidence relating to its hiring of an advertising agency to encourage media publicity favorable to all of Robins' products, including the shield, and to educate the public on the availability of these products. We find no error in the trial court's ruling.

 Relevancy is a threshold standard which all evidentiary offerings must meet. Evidence is relevant when it renders the claimed inference more probable than it would be without it. *See, e.g., Bush,* 191 Colo. at 251, 552 P.2d at 511. The material elements of an exemplary damages claim are set forth in section 13–21–102, 6 C.R.S. (1973), which authorizes an award of punitive damages where the injury to the plaintiff is "attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings." In the context of a punitive damages claim, the relevancy threshold is satisfied if the offered evidence tends to make more probable than not the existence of any of the statutory elements. In recognition of this standard of relevancy, courts have acknowledged that

"[e]vidence of other acts of defendant than those alleged and for which damages are sought, both preceding as well as following the particular acts, is admissible under an issue of exemplary damages if so connected with the particular acts as tending to show defendant's disposition, intention or motive in the commission of the particular acts for which damages are claimed." *Charles F. Curry and Co. v. Hedrick,* 378 S.W.2d 522, 536 (Mo.1964).

*See also, e.g., Kane v. Oehler,* 62 Mont. 417, 205 P. 245 (1922); *see also Voltube Corp. v. B & C Insulation Products,* 20 N.J. Super. 250, 89 A.2d 713 (1951).

 The challenged evidence was relevant to Palmer's claim for exemplary damages. This evidence demonstrated a motive on the part of Robins to profit by making exaggerated statements regarding the safety and efficacy of its product. There was testimony from a former Robins' employee and licensed pharmacist that a lay publicity campaign for a prescription item, such as the shield, is "improper and dangerous." Although Robins' president

conceded this point in his deposition testimony, the company itself ignored this salutary standard. Evidence of the lay publicity campaign, therefore, tended to establish the statutory predicate for an award of punitive damages.

### E. *Dr. Preston's Memorandum—Exhibit HHH*

Robins claims error in the trial court's exclusion of a portion of Exhibit HHH, which was a memorandum written by Dr. Ellen Preston, Robins' project coordinator for the shield. In the memorandum Dr. Preston described a June 1973 telephone conversation with Dr. Duncan Reid of Tucson, Arizona, in the course of his reporting a septic abortion to Robins. The court admitted the following part of Exhibit HHH, over Palmer's objection, as evidence of Robins' state of mind and of the alleged difficulties it encountered in its investigation of adverse reactions:

"I called Dr. Reid in followup to my letter of June 21, 1973 to which he had not responded. Dr. Reid indicated that he did not intend to become further involved in this situation with us or the Food and Drug Administration. I believe perhaps Dr. Reid misinterpreted the letter I wrote, and I attempted to clarify this but with little success."

The trial court excluded as inadmissible hearsay the remainder of the memorandum, which stated:

"Dr. Reid said he found it very distasteful that the Food and Drug Administration would concentrate or attempt to single out any one IUD for particular action because they all had their problems. I indicated that so far as we knew the FDA was looking at all IUDs, and since they had heard the rumor of this particular case were interested in receiving more details. Dr. Reid indicated again that he had no intention of getting further involved and that if the FDA wanted to call a conference to discuss all IUDs in the same setting he would be happy to cooperate in this manner. Dr. Reid went

on to say that this was only one isolated case and could have but very little meaning of itself with respect to IUD use. He furthermore felt that decisions as to patient management were decisions for the practicing profession and not the FDA."

 Those portions of the memorandum excluded by the trial court were reflective only of Dr. Reid's opinion on the scope and efficacy of the FDA investigation, a matter irrelevant to the issues of this case. In addition, these excluded statements of Dr. Reid were classical hearsay clearly inadmissible under any recognized exception. *See, e.g., Stone v. Union Fire Insurance Co.,* 106 Colo. 522, 107 P.2d 241 (1940); *Manby v. Sweet Investment Co.,* 78 Colo. 371, 242 P. 51 (1925).

### III. *The Warranty Claims*

Robins raises three arguments in connection with Palmer's claims for breach of express warranty, implied warranty of merchantability, and implied warranty of fitness for a particular purpose, all of which were submitted to the jury. We consider these arguments separately and find them to be without merit.

### A. *Notice*

Robins argues that the trial court should have directed a verdict in its favor on Palmer's warranty claims because the evidence was insufficient to establish that Palmer, as a condition precedent to recovery, gave reasonable notice to Robins of any breach of warranty.

 Section 4–2–607(3)(a) of the Uniform Commercial Code [§§ 4–1–101 to 4–11–102, 2 C.R.S. (1973 & 1983 Supp.)] states that "[w]here a tender has been accepted ... [t]he buyer must within a reasonable time after he discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." The process of "notification" or "giving notice" is described, in pertinent part, in section 4–1–201(26) as follows:

"A person 'notifies' or 'gives' a notice or notification to another by taking such steps as may be reasonably required to

inform the other in ordinary course whether or not such other actually comes to know of it. A person 'receives' a notice or notification when: (a) It comes to his attention. . . ."

The notice requirement in a breach of warranty action serves three purposes: (1) affording the seller an opportunity to correct any defect; (2) affording the seller an opportunity to prepare for negotiation and litigation; and (3) providing the seller a safeguard against stale claims being asserted after it is too late to investigate them. *Prutch v. Ford Motor Co.*, 618 P.2d 657, 661 (Colo.1980). Compliance with the notice requirement is generally a condition precedent to recovery for a breach of warranty claim under the Uniform Commercial Code. *E.g., Hoffman's Double Bar Pine Nursery v. Fyke*, 633 P.2d 516 (Colo.App. 1981); *Rick's Restaurant v. McFann Enterprises*, 39 Colo.App. 545, 570 P.2d 1305 (1977); 4 R. Anderson, *Uniform Commercial Code* § 2–607:19 (3d ed.1983).

■ While section 4–2–607(3)(a) provides for notification to the seller "[w]here a tender has been accepted," we construe the word "seller," as used in that section, to refer only to the immediate seller who tendered the goods to the buyer. *Goldstein v. G.D. Searle & Co.*, 62 Ill.App. 3d 344, 19 Ill.Dec. 208, 378 N.E.2d 1083 (1978). Under this construction, as long as the buyer has given notice of the defect to his or her immediate seller, no further notification to those distributors beyond the immediate seller is required. *Id.; see also Prutch*, 618 P.2d 657. From the perspective of the unsophisticated consumer, this interpretation of the statute promotes fairness by requiring the consumer to give notice only to the party with whom the consumer has dealt:

"As between the immediate parties to the sale, [the notice requirement] is a sound commercial rule, designed to protect the seller against unduly delayed claims for damages. As applied to personal injuries, and notice to a remote seller, it becomes a booby-trap for the unwary. The injured consumer is seldom 'steeped in the business practice which justifies the rule,' and at least until he has legal advice it will not occur to him to give notice to one with whom he has had no dealings." W. Prosser, *Handbook of the Law of Torts* § 97 at 655 (4th ed.1971).

In addition, from the standpoint of the remote manufacturer, notice to the immediate seller, in the ordinary course of events, will inure to the manufacturer's benefit. This is so because the "Code envisions that when the consumer's notice of breach is given to his immediate seller, such person to preserve any right of action he may have for breach of implied warranty will give notice to his immediate seller, and so on upstream until the seminal point of the distributive chain is reached." *Goldstein,* 62 Ill.App. 3d at 348, 19 Ill.Dec. at 212, 378 N.E.2d at 1087. This sequential notice requirement is thus calculated to provide the remote manufacturer with notice and an opportunity to correct the defect, where possible, and to investigate claims that might eventuate in litigation.

Section 4–2–103(1)(d) of the Uniform Commercial Code defines a seller as "a person who sells or contracts to sell goods." Since the cost of the shield to Dr. Petri was included in his fee for the insertion of that device in Palmer, Dr. Petri in this case was Palmer's immediate seller. Dr. Petri became aware, before Palmer did, that the shield was responsible for her injuries. The evidence quite conclusively establishes that on December 8, 1973, Dr. Petri diagnosed Palmer's condition as "septic abortion secondary to IUD infection." The grave uterine infection and subsequent complications which Palmer manifested on November 18, 1973, were the source of this diagnosis. It was Dr. Petri's testimony that his opinion with regard to the cause of Palmer's condition "solidified" with the passage of time after he learned, through medical literature, of the threat of septic abortion posed by the design characteristics of the shield. Since no prescribed form of notice is required, *see Comet Industries, Inc. v. Best Plastic Container Corp.*, 222 F.Supp. 723 (D.Colo.1963); *Hoffman's*

*Double Bar Pine Nursery*, 633 P.2d 516, there is sufficient evidence establishing that Palmer gave notice to Dr. Petri of the defective character of the shield and that this notice "came to his attention," within the meaning of section 4–1–201(26), when Palmer presented herself to him in a life-threatening condition on November 18, 1973, and the days immediately following.

We thus conclude that, in view of our construction of the notice requirement in section 4–2–607(3)(a) of the Uniform Commercial Code, Robins' motion for directed verdict was not well taken. We note in passing, however, that the trial court, instead of limiting the notice requirement to the immediate seller, instructed the jury that Palmer was under an obligation to give notice to Robins, the remote manufacturer, within a reasonable time after she discovered or should have discovered the breach of warranty. While this instruction placed a burden on Palmer more stringent than that required by law, any error in that regard clearly benefited Robins and must be regarded as harmless.[3]

3. The trial court's instruction stated as follows:
"The plaintiff, Carie M. Palmer, within a reasonable time after she discovered or should have discovered any breach of express or implied warranty, must have notified the Defendant, A.H. Robins Co., Inc., of the breach or she may not recover on her claims for breach of express or implied warranty. What amounts to a reasonable time depends upon the facts and circumstances as disclosed by the evidence in this case.
"Notice may be oral or written. No particular form is required. Notice is sufficient if it informs the Defendant of the alleged breach of warranty."
Even under the more stringent test of notice stated in the instruction, a review of the record indicates that there was substantial circumstantial evidence to support the denial of Robins' motion for a directed verdict. Whether notice is "reasonable" is a question of fact to be determined from the totality of circumstances. *Goldstein v. G.D. Searle & Co.*, 62 Ill.App.3d 344, 19 Ill.Dec. 208, 378 N.E.2d 1083 (1978). Since an injured lay consumer would not ordinarily know of the notice requirement, the reasonableness of any notice should be viewed under a more relaxed standard than that exacted of commercial purchasers. *See Maybank v. S.S. Kresge Co.*, 302 N.C. 129, 273 S.E.2d 681 (1981);

**B. Express Warranty**

Robins challenges the submission of Palmer's express warranty claim to the jury because, in its view, there was insufficient evidence to establish that Robins' claimed representations constituted part of the transaction resulting in Palmer's selection, purchase, and use of the shield. In submitting Palmer's express warranty claim to the jury the trial court instructed the jury that Palmer, in order to recover, had to establish by a preponderance of the evidence that, *inter alia*, "[t]he defendant expressly warranted the Dalkon Shield inserted into the plaintiff's uterus to be one or more of the following:

a. 'The Modern Superior IUD';

b. 'lowest pregnancy rate ... 1.1%';

c. 'safe';

d. 'prevent pregnancy without producing any general effects on the body, blood or brain.'"

Section 4–2–313(1) of the Uniform Commercial Code states:

"(a) Any affirmation of fact or promise made by the seller to the buyer which

*see also* section 4–2–607(3)(a), comment 4 ("'A reasonable time' for notification from a retail consumer is to be judged by different standards so that in his case it would be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy."). In the context of a retail purchase, the filing of a lawsuit, under some circumstances, may be sufficient to provide notice to a defendant. *See Goldstein*, 62 Ill.App.3d 344, 19 Ill.Dec. 208, 378 N.E.2d 1083; *Maybank*, 302 N.C. 129, 273 S.E.2d 681. Further, there is substantial evidence in the record establishing that even prior to the date of Palmer's septic abortion Robins had notice of similar complaints and was afforded an opportunity to investigate the potential for septic abortions posed by the shield. Finally, even though Robins was not notified of Palmer's claim until she filed her lawsuit approximately two years after the injury, Robins does not contend that it was somehow denied evidence relating to her injury that might otherwise have been available had there been earlier notice, nor does Robins allege that it was prejudiced in any other manner by the notice it actually received of Palmer's claim. *See Schlottman v. Pressey*, 195 F.2d 343 (10th Cir.1952); *Goldstein*, 62 Ill.App.3d 344, 19 Ill. Dec. 208, 378 N.E.2d 1083.

relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

"(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."

■■■ It is not necessary for an express warranty that "the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but ... a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." § 4–2–313(2). Whether a particular statement constitutes an express warranty is generally an issue of fact. *See, e.g., Glen Peck, Ltd. v. Fritsche,* 651 P.2d 414 (Colo.App.1981); *Stroh v. American Recreation and Mobile Home Corp.,* 35 Colo. App. 196, 530 P.2d 989 (1975). When a warranty has been created, it "extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who [was] injured by breach of the warranty." § 4–2–318.

■■■ Palmer's express warranty claim was properly submitted to the jury. Palmer testified that Dr. Petri, before prescribing the shield, indicated to her that the shield was a superior IUD, safer than the birth control pill, and 98.9% effective in preventing pregnancy. Dr. Petri had drawn this information from a review of Robins' literature, conversations with Robins' representatives, and the Davis article. Palmer also subsequently read literature printed by the shield's manufacturer which reiterated the safety and effectiveness claims. These statements qualify under section 4–2–313(1) as affirmations of fact and product descriptions upon which Palmer relied in using the shield, as opposed to the birth control pill, as a method of contraception. There was sufficient evidence, in our view, to support a reasonable conclusion by the jury that Robins' representations concerning the superiority, effectiveness, and safety of the shield formed an essential part of Palmer's decision to have that device inserted in her body and to continue using it as a safe and effective method of contraception.

### C. *Implied Warranties*

Robins contends that the trial court erred in submitting to the jury Palmer's claims for breach of implied warranty of fitness for a particular purpose and implied warranty of merchantability because, according to Robins, there was no evidence establishing that the particular purpose for which Palmer selected the shield was different from its ordinary purpose.

■■■ A contract for the sale of goods by "a merchant with respect to goods of that kind" gives rise to an implied warranty of merchantability, unless properly excluded or modified. § 4–2–314(1). Merchantability, as pertinent here, means that the goods "[a]re fit for the ordinary purposes for which such goods are used," § 4–2–314(2)(c), "[a]re adequately contained, packaged, and labeled," § 4–2–314(2)(e), and "[c]onform to the promises or affirmations of fact made on the container or label if any," § 4–2–314(2)(f). An implied warranty of fitness for a particular purpose arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." § 4–2–315. As noted in comment 2 to section 4–2–315:

"A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question."

This is not to say, however, that implied warranties of merchantability and fitness for a particular purpose are mutually exclusive. On the contrary, Colorado case

law recognizes that these warranties may coexist when there is sufficient evidence to support the creation of each warranty. *See Westric Battery Co. v. Standard Electric Co., Inc.,* 482 F.2d 1307 (10th Cir.1973) (under the Uniform Commercial Code adopted in Colorado, the giving of instructions on implied warranties of merchantability and fitness for particular purpose was appropriate); *Jacobson v. Dahlberg,* 171 Colo. 42, 464 P.2d 298 (1970) (recognizing that, under Uniform Sales Act, implied warranties of merchantability and fitness for particular purpose not mutually exclusive); *Lease Finance, Inc. v. Burger,* 40 Colo.App. 107, 575 P.2d 857 (1977) (under Uniform Commercial Code, implied warranties of merchantability and fitness for particular purpose may coexist).

 There was sufficient evidence in this case to justify the submission of both warranty claims to the jury. Dr. Petri's usual practice in advising patients about contraception was to inform them about the effectiveness of the pill and also to warn them about the possible adverse consequences of its use, such as stroke, vascular clotting, and coronary occlusion in later life. Dr. Petri followed this procedure with Palmer when she visited his office on January 16, 1973. Palmer rejected the pill as a contraceptive method because of her apprehensions over its safety and the serious health problems associated with it. It was at this point, according to Palmer, that Dr. Petri recommended the shield because it was safer and almost as effective as the pill. Dr. Petri's recommendation was based on Robins' representations concerning the safety features of the shield as well as the 1.1% pregnancy rate associated with its use. Palmer, relying on Dr. Petri's recommendation, chose the shield because she believed it would be safer than other forms of contraception and would be almost as effective as the pill in preventing pregnancy. This evidence, when viewed in a light most favorable to Palmer and all reasonable inferences therefrom are drawn in her favor, *e.g., Gossard v. Watson,* 122 Colo. 271, 221 P.2d 353 (1950), is sufficient to support Palmer's claim that she selected

the shield not only to prevent pregnancy, the ordinary purpose for which an IUD is selected, but also for the particular purpose of providing her with a "safe" contraceptive device that averted such hazards as stroke, vascular clotting, and other harmful effects on the body. There can be no question that Robins knew or had reason to know of the special or particular safety features attributed to its product, since both Dr. Petri and Palmer premised their decisions on affirmative representations made by Robins. Nor can there be any question about Palmer's reliance upon Robins to furnish a product which would fulfill these particular purposes. Under these circumstances, the submission to the jury of the dual implied warranties of fitness for a particular purpose and merchantability was justified.

### IV. *Sufficiency of Evidence on Negligence Claim*

Robins argues that Palmer's negligence claim should not have been submitted to the jury because expert testimony was necessary to establish the standard of care applicable to a reasonably prudent pharmaceutical company and Palmer, according to Robins, failed to present any such evidence. We are unpersuaded by Robins' argument.

 To recover under a negligence theory, a plaintiff must show that the defendant breached a duty of care owed to the plaintiff and thereby caused the plaintiff's damages. *E.g., Franklin v. Wilson,* 161 Colo. 334, 422 P.2d 51 (1966); *Roessler v. O'Brien,* 119 Colo. 222, 201 P.2d 901 (1949). A legal duty to use reasonable care arises in response to a foreseeable risk of injury to others. *Metropolitan Gas Repair Service, Inc. v. Kulik,* 621 P.2d 313 (Colo.1980). "The court determines, as a matter of law, the existence and scope of the duty—that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection." *Id.* at 317. When the standard of care involves questions beyond the competence of ordinary persons, expert testimony may be required to establish that

standard. In medical malpractice cases, for example, the scope of a physician's duty is often determinable only on the basis of expert testimony precisely because ordinary jurors would be unfamiliar with the special knowledge and skill required for the exercise of reasonable care in the practice of medicine. *See, e.g., Bloskas v. Murray,* 646 P.2d 907 (Colo.1982); *Mallett v. Pirkey,* 171 Colo. 271, 466 P.2d 466 (1970). Even in medical malpractice, however, when the standard of care "is regarded as within the common knowledge of laymen, as where the surgeon saws off the wrong leg, or there is injury to a part of the body not within the operative field, it has been held that the jury may infer negligence without the aid of any expert." W. Prosser, *Handbook of the Law of Torts* § 32 at 164–65 (4th ed.1971); *see Farrah v. Patton,* 99 Colo. 41, 59 P.2d 76 (1936); *Daly v. Lininger,* 87 Colo. 401, 288 P. 633 (1930).

In this case the standard of care applicable to Robins was "that degree of care which a reasonably prudent drug manufacturer would use under the same or similar circumstances." *Hamilton,* 37 Colo.App. at 383, 549 P.2d at 1106. Negligence in this context means "a failure to do an act which a reasonably prudent drug manufacturer would do, or the doing of an act which a reasonably prudent drug manufacturer would not do, under the same or similar circumstances." *Id.* The question whether Robins breached the standard of care applicable to a reasonable pharmaceutical company does not entail specialized knowledge or skill unique to a scientific discipline and beyond the knowledge and experience of the average jury. On the contrary, resolution of the negligence issue turns on an assessment of evidence relating to Robins' decision to market the shield with a minimum of testing and without a warning as to its actual or potential health hazards, and to continue the distribution of its device notwithstanding information tending to indicate significant dangers associated with the product. The ultimate determination of whether Robins' conduct comported with that degree of care which a reasonably prudent drug manufacturer would use under the same or similar circumstances was well within the ken of persons of ordinary intelligence. Thus, expert opinion evidence was not essential to Palmer's claim in negligence.[4]

## V. Jury Instructions: Negligence Per Se and the Burden of Proof

### A. Negligence Per Se

Robins challenges the trial court's instruction authorizing the jury to return a verdict in favor of Palmer on her negligence claim if it found that Robins violated section 25–5–403(1)(a) of the Colorado Food and Drug Act, §§ 25–5–401 to 25–5–425, 11 C.R.S. (1982), and that this violation proximately caused Palmer's injuries.[5] Robins

---

**4.** In connection with its claim that expert testimony was required to establish the standard of care applicable to a reasonable pharmaceutical company, Robins argues that two instructions given by the trial court on the duty to warn confused the standard of care applicable to this case. Instruction No. 32, in essence, stated that a manufacturer is obliged to use reasonable care to warn the medical profession of a danger which it knows or reasonably should know is associated with its product and the danger is such that it would not be obvious to an ordinarily competent physician dispensing the product. Instruction No. 33 stated that a warning is not required when the danger would be readily apparent and obvious to an ordinarily competent physician from the nature of the product itself or from other information which an ordinarily competent physician could reasonably be expected to know. We believe these instructions,

when read and considered with all other instructions on the standard of care, did not confuse the standard of care applicable to Robins, namely, that of a reasonably prudent pharmaceutical company.

**5.** The instruction on negligence per se read as follows:

"At the time of the injuries in question in this case, the following state statutes of the State of Colorado were in full force and effect:

'25–5–403. [(1)] The following acts and the causing thereof within this state are prohibited:

(a) The manufacture, sale, or delivery or the holding or offering for sale of any food, drug, device, or cosmetic that is adulterated or misbranded; ...'

\* \* \* \* \* \*

argues that the trial court should not have given this instruction for three reasons: (1) the act does not apply to a prescription device, such as the shield; (2) the shield falls within a statutory exemption created by section 25–5–415(1)(f); and (3) even if the shield is not exempt from the act, Palmer failed to present sufficient evidence which would support a finding of causation. We reject these arguments.

Section 25–5–403(1)(a) prohibits "[t]he manufacture, sale or delivery or the holding or offering for sale of any ... device ... that is ... misbranded." A "device," as used in the Colorado Food and Drug Act, includes any instrument intended to affect the structure or function of the human body. § 25–5–402(8). A device is deemed misbranded, under section 25–5–415(1)(a), if "its labeling is false or misleading in any particular." Section 25–5–402(15) defines "labeling" to include "all labels and other written, printed, or graphic matter upon an article or any of its containers or wrappers, or accompanying such article." The term "label," under section 25–5–402(14), means a "display of written, printed, or graphic matter upon the immediate container of any article ...." Section 25–5–415(1)(f) states as follows:

"where any requirement as to ... adequate directions for use, as applied to any drug or device, is not necessary for the protection of the public health, the department shall promulgate regulations exempting such drug or device from such requirement, and articles exempted under the [Federal Food, Drug and Cosmetic Act] shall also be exempt."

■ In connection with its argument that the Colorado Food and Drug Act is not applicable to this case, Robins suggests that the legislature did not intend to apply the statutory misbranding prohibition to medical devices, such as the shield, which

were distributed by prescription through medical practitioners to the lay public. We find no basis in the act for this assertion. The prohibition of section 25–5–403(1)(a) extends to "[t]he manufacture, sale, or delivery or the holding or offering for sale of *any* ... device ... that is ... misbranded" (emphasis added), and makes no distinction between prescription and nonprescription medical devices. Moreover, in the case of the selection of an IUD, the patient will undoubtedly make the selection of a particular type of IUD in consultation with a medical professional. An IUD with a false or misleading label, which is encompassed within the definition of a misbranded device contained in section 25–5–415(1)(a), may cause a physician to prescribe a product unsuitable for a particular patient and thereby bring about the type of consumer injury the act is designed to prevent.

■ In support of its contention that the shield qualified for the statutory exemption in section 25–5–415(1)(f) of the Colorado Food and Drug Act, Robins points to a federal regulation then in effect, 21 C.F.R. § 1.106(d) (1972), which was promulgated pursuant to 21 U.S.C. § 352(f) (1970) and exempted certain "prescription devices" available only through medical professionals from the "directions for use" labeling requirements of the federal legislation. We are satisfied that the statutory exemption of section 25–5–415(1)(f) does not apply to this case. Palmer's negligence claims centered primarily on Robins' representations that the use of the shield offered the "lowest pregnancy rate [of] 1.1%," "prevent[ed] pregnancy without producing any general effects on the body, blood or brain," and "provid[ed] safe, sure, sensible contraception." The allegedly misleading nature of these labeling representations clearly related to the safety and effectiveness of the product and not to directions for its use. Because the plain

---

'25–5–415. Misbranding. (1) A drug or device shall be deemed to be misbranded:
(a) If its labeling is false or misleading in any particular; ...'
"A violation of the above statutes constitutes negligence, as negligence is elsewhere defined in these instructions.

"If you find such a violation, you may only consider it if you also find that it was a proximate cause of the injuries."
The word "proximate" has since been eliminated from the Colorado Civil Jury Instructions. *See* CJI–Civ.2d 9:14 and 9:26.

terms of section 25–5–415(1)(f) create an exemption with respect to "directions for use," and do not extend the exemption to labeling with respect to safety or effectiveness, the exemption is not applicable so as to exclude Palmer's claim of negligence per se from the misbranding prohibition of section 25–5–403(1)(a).

 Turning to Robins' third argument, we conclude that there was sufficient evidence in this case to warrant submission of the negligence per se issue to the jury. To recover under a theory of negligence per se, Palmer was required to prove that the violation of the statute caused her injuries. *Lambotte v. Payton,* 147 Colo. 207, 363 P.2d 167 (1961). Although Palmer was unable to produce the precise labeling document on which she relied, there was abundant evidence establishing that such material existed and was the primary factor in Dr. Petri's recommendation of the shield to Palmer and her decision to accept his recommendation and to continue using the shield. Palmer testified that after being fitted with the shield, she continued with its use because, based on the representations in Robins' written material given to her by Dr. Petri, she believed it would provide a safe and effective method of contraception. Under the state of the record before us, which must be viewed in a light most favorable to Palmer, *e.g., Gossard,* 122 Colo. 271, 221 P.2d 353, we are satisfied that reasonable persons could conclude that false or misleading labeling employed by Robins caused Palmer's injuries.

### B. *The Burden of Proof Instruction*

Robins next asserts that the trial court erred in instructing the jury that the burden of proof means "the obligation resting on the party who asserts a proposition to establish the same by a preponderance of the evidence." Because Robins questioned at trial whether Palmer actually had a shield in her uterus at the onset of the uterine infection leading to the septic abortion on November 18, 1973,[6] it claims that the court's instruction had the effect of requiring Robins to prove this fact when, instead, it should have required Palmer to prove that the shield was in place at the time of the septic abortion. We find this argument devoid of merit.

 The challenged instruction, in addition to defining the burden of proof, stated that it was the plaintiff's burden to prove "a claim for actual (compensatory) damages by a preponderance of the evidence." Furthermore, several other instructions enumerated the liability elements essential to Palmer's respective claims and referred to these elements as "propositions." After listing these propositions in numerical order, these instructions then concluded with the following statement:

"If you find that any one or more of these ... propositions has not been established by a preponderance of the evidence, then your verdict on this claim for actual (compensatory) damages must be for the defendant.

"On the other hand, if you find that all of these ... propositions have been established by a preponderance of the evidence, then your verdict on this claim for actual (compensatory) damages must be for the plaintiff."[7]

---

**6.** Robins premised this factual contention on the absence of any hospital records noting the recovery of the shield before, during, or after Palmer's septic abortion or hysterectomy. Robins claimed this evidence circumstantially established that the shield was not in Palmer's body at the onset of her infection and, consequently, was not the cause of her septic abortion. The jury obviously found to the contrary. Sufficient evidence in the record supports the jury's conclusion. Dr. Petri testified that he inserted a shield into Palmer's uterus in January 1973 and that his records indicated the shield was still in

place in August 1973. Palmer testified that, to the best of her knowledge, the shield remained in her body until after her septic abortion. Finally, there was trial testimony indicating that Dr. Petri removed the shield when he examined Palmer shortly after she underwent the septic abortion, prior to the hysterectomy, which was performed by Dr. Austin, his associate.

**7.** As an example of the elemental instructions on liability, we set forth in full the court's instruction on Palmer's negligence claim:

Thus, the reference in the challenged instruction to "propositions" was clearly directed to the liability elements or "propositions" that Palmer had to establish in order to recover and, in this respect, was a correct statement of the law that could not possibly have been misinterpreted as somehow shifting the burden of proof to Robins on any of these "propositions."

### VI. *Issues Relating to Punitive Damages*

Robins raises numerous and varied issues relating to the $6,200,000 punitive damages award. The range of questions include the following: the applicability of the one year limitation of section 13–80–104, 6 C.R.S. (1973), to a punitive damages claim; the facial constitutionality of the punitive damages statute, section 13–21–102, 6 C.R.S. (1973), and other constitutional claims predicated on its application to Robins under the facts of this case; the applicability of the punitive damages statute to a strict liability products claim in tort; the sufficiency of the evidence to support the punitive damages award in this case; the propriety of certain jury instructions; and the claimed excessiveness of the $6,200,000 punitive award. We will address these questions in the order stated.

### A. *The Statute of Limitations*

Robins contends that Palmer's claim for punitive damages was barred by operation of the one year statute of limitations in section 13–80–104, 6 C.R.S. (1973), which states that "[a]ll actions and suits for any penalty or forfeiture of any penal statute . . . shall be commenced within one year after the offense is committed and not after that time." The resolution of Robins' contention turns on whether Palmer's claim for punitive damages was for a "penalty" based on the violation of a "penal statute" within the contemplation of section 13–80–104.

■■■■ In Colorado punitive damages are a creature of statute, namely, section 13–21–102, 6 C.R.S. (1973), which provides:

"In all civil actions in which damages are assessed by a jury for a wrong done to the person, or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages."

Although a claim for punitive damages under section 13–21–102 is undoubtedly punitive in character, *e.g., Mince v. Butters,* 200 Colo. 501, 616 P.2d 127 (1980); *Frick v. Abell,* 198 Colo. 508, 602 P.2d 852 (1979); *French v. Deane,* 19 Colo. 504, 36 P. 609 (1894), it is not a separate and distinct cause of action. Rather, it is auxiliary to an underlying claim for actual damages. As was recently observed in *Harding Glass Co., Inc. v. Jones,* 640 P.2d 1123, 1127 (Colo.1982), section 13–21–102 "applies only when a civil wrong has been

"In order for the Plaintiff, Carie M. Palmer, to recover from the Defendant, A.H. Robins Co., Inc., on her claim of negligence, you must find all of the following have been established:
1. The Defendant, A.H. Robins Co., Inc., manufactured the Dalkon Shield inserted into Plaintiff's uterus;
2. The Defendant, A.H. Robins Co., Inc., was negligent in testing, designing, manufacturing, promoting or marketing the Dalkon Shield in that it failed to exercise reasonable care to prevent the Dalkon Shield from creating an unreasonable risk of injury to the person of one who might reasonably be expected to use, consume or be affected by it while it was being used in the manner the Defendant might reasonably have expected; and

3. The Plaintiff sustained injuries which were proximately caused by such negligence, if any, while the Dalkon Shield was being used in a manner the Defendant should reasonably have expected.
"If you find that any one or more of these three propositions has not been established by a preponderance of the evidence, then your verdict on this claim must be for the Defendant.
"On the other hand, if you find that all three of these propositions have been established by a preponderance of the evidence, then your verdict on this claim for actual (compensatory) damages must be for the Plaintiff."

attended by aggravating circumstances," and "by its own terms ... has no application in the absence of a successful underlying claim for actual damages." *See also Armijo v. Ward Transport, Inc.*, 134 Colo. 275, 302 P.2d 517 (1956); *Ress v. Rediess*, 130 Colo. 572, 278 P.2d 183 (1954). Section 13–21–102 thus permits an award for punitive damages only in conjunction with an underlying and independent "civil action" in which actual damages are assessed for some legal wrong to the injured party.

Colorado statutes which have been construed as "penal" have been those which create a new and distinct statutory cause of action. *See, e.g., Carlson v. McCoy*, 193 Colo. 391, 566 P.2d 1073 (1977) (statutory action for treble damages based on landlord's failure to comply with security deposit law is penal for purposes of one year statute of limitations because treble damages award constitutes an independent statutory "penalty or forfeiture"); *Atchison, Topeka and Santa Fe R.R. Co. v. Tanner*, 19 Colo. 559, 36 P. 541 (1894) (statutory claim for recovery of twice the value of every unreported steer run over and killed on railroad property is for recovery of a discrete statutory penalty and is subject to the penal statute of limitations). The punitive damages statute, however, does not create an independent cause of action, but merely authorizes increased damages ancillary to an independent claim for actual damages. Furthermore, a penal statute, in contrast to the punitive damages statute, requires no proof of actual damages as a condition precedent to recovery. *Denver and Rio Grande R.R. Co. v. Frederic*, 57 Colo. 90, 140 P. 463 (1914). We therefore conclude that a claim for punitive damages under section 13–21–102, being ancillary to an independent civil claim for actual damages, does not constitute an action for the recovery of a "penalty ... of [a] penal statute" within the intendment of the one year limitation period of section 13–80–104.

### B. *Constitutional Issues*

Robins argues that the punitive damages statute is facially vague and that the appli-

cation of the statute to it in this case cannot be reconciled with due process of law, *U.S. Const.* amend. XIV; *Colo. Const.* art. II, § 25, the federal constitutional prohibition against double jeopardy, *U.S. Const.* amends. V and XIV, and the federal constitutional prohibition against cruel and unusual punishment, *U.S. Const.* amends. VIII and XIV. We find no merit in these arguments.

1. *Facial Vagueness.* Robins contends that the punitive damages statute is unconstitutionally vague in violation of due process of law. The controlling question in a void for vagueness challenge is whether the statute proscribes conduct in terms so vague that persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application. *E.g., Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *People ex rel. City of Arvada v. Nissen*, 650 P.2d 547 (Colo.1982). Basic rules of statutory adjudication must guide the resolution of this question. A statute is presumed to be constitutional, and the burden is on the party attacking the statute to establish its unconstitutionality beyond a reasonable doubt. *Nissen*, 650 P.2d at 550; *People in the Interest of C.M.*, 630 P.2d 593 (Colo.1981). "Also, it must be borne in mind that due process of law has never required mathematical exactitude in legislative draftsmanship." *Nissen*, 650 P.2d at 550. While the statute must be "sufficiently specific to give fair warning of the proscribed conduct, it also must remain sufficiently general to be capable of application under varied circumstances." *Id.*

When viewed under these rules, it is clear that section 13–21–102 is not void for vagueness. The statutory terms "circumstances of fraud" and "a wanton and reckless disregard" are sufficiently clear to persons of ordinary intelligence to afford a practical guide for behavior and are capable of application in an even-handed manner. Fraud generally consists of a false representation of a material existing fact,

made with knowledge or utter disregard of its falsity, with the intent to induce another to rely upon the representation and to take detrimental action thereon. *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458 (1937); *see also Knight v. Cantrell,* 154 Colo. 396, 390 P.2d 948 (1964); *Ginsberg v. Zagar,* 126 Colo. 536, 251 P.2d 1080 (1952). The term "wanton and reckless" is likewise no stranger to Colorado law. It involves conduct that creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences. *See, e.g., Coffman v. Seifert,* 175 Colo. 224, 486 P.2d 422 (1971); *Brown v. Spain, Jr.,* 171 Colo. 205, 466 P.2d 462 (1970); *Steeves v. Smiley,* 144 Colo. 5, 354 P.2d 1011 (1960). Colorado's punitive damages statute passes constitutional muster under the void for vagueness doctrine.[8]

▇▇▇▇▇ 2. *Other Due Process Claims.* Robins' due process arguments are several. It initially asserts that the potential for multiple punitive awards involving the same product clashes with the concept of fundamental fairness. If this argument were followed to its logical conclusion, however, it would mean that "punitive damages could never be assessed against a manufacturer of a mass produced article." *Grimshaw v. Ford Motor Co.,* 119 Cal.App. 3d 757, 812, 174 Cal.Rptr. 348, 383 (1981). The need for punitive damages is just as real as the danger of multiple awards. *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437 (1980); Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1257, 1325 (1976). While the propriety of punitive damages must be decided on a case-by-case basis, there are safeguards available to a trial court faced with a defendant's claim that, due to past punitive awards arising out of the same course of conduct, it will face economic disaster from a substantial punitive damages verdict in the case at issue. When an adequate showing is made by the defendant, the court might consider granting a bifurcated trial on the issue of punitive damages in order to avoid any prejudice to the defendant on the issue of liability. *See* C.R.C.P. 42(b). The jury under such circumstances could consider at

---

8. We further note that the trial court fully explained the meaning of "fraud" and "wanton and reckless" in its instructions to the jury, thereby enhancing the jury's ability to apply the statutory elements in determining whether Robins' conduct was such as to justify an assessment of punitive damages. One of the instructions on "fraud" was as follows:

"Fraud consists of a false representation of a past or present material fact made without an honest belief that it was true with the intent that women, such as Plaintiff, or their doctors act in reliance upon it.

"Alternatively, fraud may also consist of concealment of a past or present material fact or failure to disclose a past or present material fact where there is a duty to disclose it with the intent of creating a false impression of the actual facts in the mind of a woman, like Plaintiff, or her doctor so that the Plaintiff or her doctor would take a course of action they might not take if they knew the actual facts.

"Before concluding that Plaintiff's injury was attended by circumstances of fraud, as defined above, you must also find that Plaintiff or her doctor justifiably relied and acted upon said false representation, or, that Plaintiff or her doctor took action or refrained from taking action, justifiably relying on the assumption that the concealed or undisclosed fact did not exist or was different from what

it actually was, and that as a proximate result of Plaintiff's reliance or the reliance of her doctor, Plaintiff sustained injuries.

"The above elements must be proven beyond a reasonable doubt before you may find that Plaintiff's injuries were attended by circumstances of fraud."

The instruction on "wanton and reckless conduct" stated:

"Wanton and reckless conduct consists of either the purposeful failure to do an act which the defendant was under a duty to perform, which omission the defendant knew created a danger to another's person and which it heedlessly failed to perform, without regard to the consequences or the rights and safety of another's person, or an affirmative act purposefully committed which the defendant knew was dangerous to another's person and which it performed heedlessly, without regard to the consequences or of the rights and safety of another's person.

"As a comparison, ordinary or simple misconduct is the passive inattention to one's conduct and actions; it is the failure to do an act which a reasonably prudent person would do, or the doing of an act which a reasonably prudent person would not do, under the same or similar circumstances."

the second phase of the trial the amount of any unsatisfied or satisfied past punitive awards as well as the past and present financial condition of the defendant.[9] Another safeguard, closely related to a bifurcated proceeding, is to instruct the jury, when so requested by the defendant, that it may properly consider the amount of past punitive verdicts imposed on the defendant as a result of its marketing conduct. *See Wangen,* 97 Wis.2d at 304, 294 N.W.2d at 459–60. Finally, close judicial scrutiny of a punitive damages verdict, against the backdrop of the particular circumstances of the case, is another means of assuring that the award is proportionate to the defendant's wrongdoing, is commensurate with the defendant's financial ability to pay, and actually serves the purposes of punishment and deterrence. *See, e.g., Grimshaw,* 119 Cal. App.3d at 818–21, 174 Cal.Rptr. at 388–89; *Wangen,* 97 Wis.2d at 304–06, 294 N.W.2d at 459–61; *cf. Curtis Publishing Co. v. Butts,* 388 U.S. 130, 160, 87 S.Ct. 1975, 1994, 18 L.Ed.2d 1094 (1967) (plurality opinion) (First Amendment guarantee of freedom of press adequately protected by judicial control over excessive punitive damage awards in defamation actions).

■■■■■ Robins next contends that the potential for "punitive overkill" arising from multiple punitive damages awards results in an unconstitutional application of the punitive damages statute in this case. A party, however, is not generally entitled to assail the constitutionality of a statute except as he is adversely affected by its application in a given case. *See, e.g., People in the Interest of C.M.,* 630 P.2d 593; *People v. Wimer,* 197 Colo. 191, 591 P.2d 87 (1979). Robins' claim of "punitive overkill," when viewed in this light, takes on a speculative cast. The record here is devoid of any evidentiary showing that Robins experienced such a number of past punitive damages verdicts as to render the award in this case so oppressive as to raise a colorable due process claim.

■■■■■ Robins also argues that, because of the punitive nature of an award under section 13–21–102, it should have been afforded all the procedural safeguards applicable to criminal proceedings. To the contrary, the nature and purposes of punitive damages are sufficiently removed from the criminal process as to render inapplicable the traditional safeguards provided to one accused of crime. *See Curtis Publishing Co.,* 388 U.S. at 159, 87 S.Ct. at 1993; *Malandris v. Merrill Lynch, Pierce, Fenner and Smith,* 703 F.2d 1152, 1173 (10th Cir.1981), *cert. denied,* —— U.S. ——, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). Moreover, section 13–25–127(2), 6 C.R.S. (1973), provides a significant safeguard to a civil defendant by requiring that the statutory elements of a punitive damages claim

---

**9.** In the course of our opinion in *Leidholt v. District Court,* 619 P.2d 768, 771 n. 2 (Colo. 1980), we stated that "we reject the procedure which *requires* a bifurcated trial when punitive damages are sought." (Emphasis added). The issue in *Leidholt* was whether the plaintiff, in a medical malpractice action involving the failure to remove a surgical sponge from the surgical site during the course of a laminectomy, was entitled to pretrial discovery of the defendant's financial condition in connection with a punitive damages claim. We held that *"prima facie* proof of a triable issue on liability for punitive damages is necessary to discover information relating to the defendant's financial status." 619 P.2d at 771. Our statement with respect to a bifurcated proceeding was not intended to foreclose trial court discretion in this matter under appropriate circumstances. In *Leidholt,* we were dealing with a traditional tort claim

involving discrete and singular conduct. Products liability litigation, in contrast, frequently involves a multiplicity of plaintiffs seeking actual and punitive damages for the sale of an unreasonably dangerous product and, in this respect, is not representative of the traditional punitive damages tort case. Because of the danger of excessive multiple punitive awards posed by certain forms of products liability litigation, we believe the trial court should consider a bifurcated trial where the defendant makes an adequate showing of substantial past punitive awards arising out of prior litigation involving the same defendant, the same product, and essentially the same liability issues involved in previous lawsuits. In the instant case, however, nothing of record indicates that Robins sustained such substantial past punitive verdicts that a bifurcated proceeding was required under C.R.C.P. 42(b).

be proven beyond a reasonable doubt. We thus reject Robins' due process claims.

■■■ 3. *Double Jeopardy.* Robins contends that the potential for multiple punitive damages awards violates the constitutional prohibition against double jeopardy. *U.S. Const.* amends. V and XIV. There is no merit to this contention. The prohibition against double jeopardy relates to criminal or quasi-criminal proceedings and not, as here, to a civil lawsuit involving an ancillary claim for punitive damages. *E.F. Hutton & Co., Inc. v. Anderson,* 42 Colo.App. 497, 596 P.2d 413 (1979); *Grimshaw,* 119 Cal.App.3d 757, 174 Cal.Rptr. 348.

■■■ 4. *Cruel and Unusual Punishment.* Robins argues that the punitive damages statute violates the constitutional proscription against cruel and unusual punishments and excessive fines. *U.S. Const.* amends. VIII and XIV. This argument centers on the proposition that the punitive damages statute fails to establish an appropriate mechanism for limiting punitive damages awards against Robins in other cases. What the argument overlooks, however, is the more fundamental proposition that the Cruel and Unusual Punishments Clause deals exclusively with the criminal process and criminal punishments. As the United States Supreme Court observed in *Ingraham v. Wright,* 430 U.S. 651, 667, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977), the Clause circumscribes the criminal process in three ways:

> "First, it limits the kinds of punishment that can be imposed on those convicted of crimes, *e.g., Estelle v. Gamble,* [429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ]; *Trop v. Dulles,* [365 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) ]; second, it proscribes punishment grossly disproportionate to the severity of the crime, *e.g., Weems v. United States,* [217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) ]; and third, it imposes substantive limits on what can be made criminal and punished as such, *e.g., Robinson v. California,* [370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) ] .... 'The primary

purpose of [the Cruel and Unusual Punishments Clause] has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes ....' *Powell v. Texas* [392 U.S. 514], 531–32 [88 S.Ct. 2145, 2153–54, 20 L.Ed.2d 1254 (1968) ] (plurality opinion)."

The Clause, therefore, has no application to a civil proceeding involving a punitive damages claim ancillary to a civil cause of action. *See United States School District No. 490 v. Celotex Corp.,* 6 Kan.App.2d 346, 355–56, 629 P.2d 196, 206 (1981).

### C. *Punitive Damages in a Strict Liability Case*

Robins raises the argument that the court erred in permitting the jury to. consider punitive damages in connection with a products liability claim based on section 402A of the *Restatement (Second) of Torts.* The argument raised here is that, because punitive damages require an evaluation of legal fault, a punitive damages award is incompatible with a strict liability claim, which necessarily focuses on the nature of the product regardless of fault. We are unpersuaded by Robins' argument.

■■■ The principle of strict liability in tort for selling a product in a condition unreasonably dangerous to the user or consumer originated in section 402A of the *Restatement (Second) of Torts* and has been adopted as the law of this state. *E.g., Hiigel,* 190 Colo. 57, 544 P.2d 983. "The crux of a strict liability claim is the product itself. Liability depends on the defective character of the product and not on the fault or culpability of a defendant in introducing the product into the stream of commerce." *Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d 579, 589 (Colo.1984); *see, e.g., Jackson v. Harsco Corp.,* 673 P.2d 363 (Colo.1983); *Hiigel,* 190 Colo. 57, 544 P.2d 983; *Kinard v. Coats Co., Inc.,* 37 Colo. App. 555, 553 P.2d 835 (1976). The purpose of a strict liability claim under section 402A is compensation for actual damages. A punitive damages claim, in contrast, is calculated to punish wrongful conduct and to

deter a repetition of that conduct. These separate and distinct purposes are significant in the resolution of the issue before us.

Because manufacturers have the means for discovering and correcting product hazards through the processes of design, testing, inspection and data analysis, a manufacturer often will have the only access to much of the information necessary for effective control of dangers likely to face consumers in using the product. Indeed, the principles of modern products liability law "evolved in part to motivate manufacturers to use this information to help combat the massive problem of product accidents." Owen, 74 Mich.L.Rev. at 1258. Most manufacturers, both from a desire to avoid liability and from a generalized sense of social responsibility, use their resources to prevent the marketing of hazardous products. To remedy the injuries resulting when a defective product is nevertheless marketed, section 402A imposes liability on the manufacturer without regard to fault. The principles of strict liability, however, are ill equipped to deal with problems at the other end of the culpability scale, that is, when an injury results from the marketing of a product in flagrant disregard of consumer safety. Owen, 74 Mich.L.Rev. at 1259. A legal tool calculated "to expose this type of gross misconduct, punish those manufacturers [engaging in] such flagrant misbehavior, and deter all manufacturers from acting with similar disregard for the public welfare" is therefore needed to fill this legal void. *Id.* at 1259–60. The remedy of punitive damages is tailor-made to fill this need.

Indeed, one virtue of Colorado's statutory remedy of punitive damages is that, from a deterrence standpoint, the precise magnitude of cost to the offending party is impossible to project. This uncertainty of cost will undoubtedly affect a manufacturer's decision to introduce a product in the marketplace. If punitive damages are predictably certain, they become just another item in the cost of doing business, much like other production costs,

and thereby induce a reluctance on the part of the manufacturer to sacrifice profit by removing a correctible defect. We therefore hold, as have many other courts, that punitive damages are recoverable in connection with a strict liability claim founded on section 402A of the *Restatement (Second) of Torts. See, e.g., Dorsey v. Honda Motor Co. Ltd.,* 655 F.2d 650 (5th Cir.1981), *modified on other grounds,* 670 F.2d 21 (5th Cir.1982), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132 (3d Cir.1973); *Klawes v. Firestone Tire & Rubber Co.,* 572 F.Supp. 116 (E.D.Wis. 1983); *Sturm, Ruger & Co., Inc. v. Day,* 594 P.2d 38 (Alaska 1979); *Toole v. Richardson-Merrell, Inc.,* 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967); *Moore v. Jewel Tea Co.,* 116 Ill.App.2d 109, 253 N.E.2d 636 (1969), *aff'd,* 46 Ill.2d 288, 263 N.E.2d 103 (1970); *Gryc v. Dayton-Hudson Corp.,* 297 N.W.2d 727 (Minn.), *cert. denied,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980); *Wangen,* 97 Wis.2d 260, 294 N.W.2d 437.

### D. *Robins' Motion for Directed Verdict*

Robins contends that the trial court erred in not granting its motion for a directed verdict on Palmer's punitive damages claim. In resolving this question we must view the evidence in a light most favorable to Palmer and determine whether, when so viewed and all reasonable inferences are drawn to support the verdict, a reasonable jury could find beyond a reasonable doubt that Robins' injury-causing conduct was "attended by circumstances of fraud" or a "wanton and reckless disregard of the injured party's rights and feelings" as provided in section 13–21–102. *E.g., Frick,* 198 Colo. 508, 602 P.2d 852. There is ample evidence, in our view, to support the award of punitive damages in this case.

As early as June 1970, prior to its purchase of production rights to the shield, Robins had been notified that the original pregnancy projection rate had increased from the biostatistical equivalent of 1.1% to 5.5%. This information, however, was withheld from Robins' marketing personnel. Shortly after its purchase of the

shield, Robins made several design modifications without clinical testing, and then engaged in an intensive promotional campaign directed to both the medical community and lay public. Despite contrary data, Robins advertised its product as having the lowest pregnancy rate of 1.1%. Robins also held out the shield as "the modern superior" IUD, combining "minimal pregnancy rates with exceptional patient tolerance," preventing pregnancy "without producing any general effects on the body, blood or brain," and providing "safe, sure, sensible contraception." In August 1971, Robins was informed by its quality control supervisor at Chapstick of the wicking effect of the tailstring and appreciated the danger which this phenomenon posed to users. Notwithstanding this information, Robins failed to warn of this danger and made no design change in its product. Later, in June 1972, Dr. Thad Earl, a Robins consultant, alerted Robins to the danger of septic abortion from the shield, and Robins was also informed of twenty-two other incidents of septic abortions suffered by shield users, all of which occurred prior to Palmer's septic abortion on November 18, 1973. Despite this information, Robins failed to warn of this life-endangering risk to users and, as late as April 1973, still continued to advise physicians to leave the shield in place in the event of an unplanned pregnancy. This evidence, in our view, is sufficient to support a finding beyond a reasonable doubt that Robins' conduct was "attended by circumstances of fraud" and/or constituted a "wanton and reckless disregard of the injured party's rights and feelings." Robins' motion for a directed verdict on Palmer's punitive damages claim was, therefore, properly denied.

E. *Jury Instructions on Punitive Damages*

 1. *Fraud.* Robins contends that it was error for the trial court to instruct on fraud because Palmer did not specifically plead the elements of fraud in her complaint. Robins' argument overlooks the principle, previously discussed, that a claim for punitive damages is ancillary to an underlying and independent claim for actual damages. The term "circumstances of fraud," as employed in section 13–21–102, is merely a reference to those circumstances that might justify an award of punitive damages in conjunction with an award of actual damages for some independent civil wrong. The trial court's instructions in this case adequately informed the jury of the meaning of "fraud" as applicable to Palmer's claim for punitive damages.[10]

2. *Factors in Measuring Punitive Damages.* Robins claims that the trial court erred by inadequately instructing the jury on those factors which could properly be considered in determining the amount of punitive damages. These factors, as stated in the instruction, were as follows:

"1. What amount, if any, you consider to be sufficient to effectively punish the Defendant for its wrongdoing;

"2. What amount, if any, you consider to be sufficient to effectively deter others in similar circumstances;

"3. Any other factor which, in your judgment, should reasonably be considered in determining what sum, if any, ... should be awarded to Plaintiff as exemplary (punitive) damages."

The record shows that this instruction was a modification of an earlier instruction, tendered by Palmer, which listed the third factor as the financial status of the defendant. Robins apparently objected to this instruction and the court replaced the reference to the financial status of the defendant with "[a]ny other factor which, in your judgment, should reasonably be considered in determining what sum, if any, ... should be awarded as exemplary (punitive) damages."

 Robins is not in a position to complain about this instruction. The eco-

---

**10.** The trial court's general instruction on the meaning of fraud, *see* note 8, *supra,* was supplemented by definitions of "a false representation," "a material fact," and "concealment," as well as by other instructions outlining the distinction between statements of fact and opinion and the circumstances in which a duty to disclose exists.

nomic status of the defendant is a legitimate factor for the jury to consider in awarding punitive damages. *E.g., Frick,* 198 Colo. 508, 602 P.2d 852. The deletion of this factor from the original instruction, along with the substitution of the third factor in the instruction ultimately given to the jury, was clearly for Robins' benefit. Furthermore, Robins failed to tender any instruction setting forth any additional factors that it believed should properly be considered by the jury in determining the amount of exemplary damages. We therefore find no reversible error in connection with Robins' claim.

### F. *The Claim of Excessiveness*

Robins asserts that the jury award of $6,200,000 as punitive damages was a product of passion and prejudice and thus excessive as a matter of law. We reject its argument.

 Because punitive damages do not admit of precise determination, the amount of an award must necessarily rest, in the first instance, within the discretion of the fact finder. *Mince,* 200 Colo. 501, 616 P.2d 127. *See also Frick,* 198 Colo. 508, 602 P.2d 852. This does not mean, however, that fact finder discretion is absolute. On the contrary, the reasonableness of an award is always subject to judicial scrutiny in the post-trial and appellate stages of a case. As the court observed in *Frick,* 198 Colo. at 512, 602 P.2d at 854:

"The purpose for punitive damages is to punish the wrongdoer and thus deter similar conduct in the future. *Ark Valley Alfalfa Mills, [Inc. v. Day,* 128 Colo. 436, 263 P.2d 815 (1953) ]. However, exemplary damages must bear some relation to the actual damages. *Id.* Although no precise formula can be utilized in this determination, *Carlson v. McNeill,* 114 Colo. 78, 162 P.2d 226 (1945), the reasonableness of the award can be ascertained by examining the facts of the case to discover if the jury was impermissibly motivated by prejudice or properly guided by the purposes for exemplary damages. *Leo Payne Pontiac, Inc. v. Ratliff,* 29 Colo.App.

386, 486 P.2d 477 (1971), *rev'd on other grounds,* 178 Colo. 361, 497 P.2d 997 (1972).

"The factors which guide this determination, set forth by the court of appeals in *Leo Payne Pontiac, supra,* are expressly approved at this time. Those factors are: (1) the nature of the act which caused the injury; (2) the economic status of the defendant; and (3) the deterrent effect of the award on others."

 Although a ten-to-one ratio of punitive to compensatory damages warrants close judicial scrutiny, we note that high ratios have been upheld where the record shows that the jury was properly guided by the purposes of a punitive damages award in reaching its verdict. *See, e.g., Mailloux v. Bradley,* 643 P.2d 797 (Colo.App.1982) (ratios of 10:1 and 35:1 upheld); *see also, e.g., Vossler v. Richards Mfg. Co., Inc.,* 143 Cal.App.3d 952, 192 Cal.Rptr. 219 (1983) (20:1 ratio upheld); *Ettus v. Orkin Exterminating Co., Inc.,* 233 Kan. 555, 665 P.2d 730 (1983) (24:1 ratio upheld); *Leimgruber v. Claridge Associates, Ltd.,* 73 N.J. 450, 375 A.2d 652 (1977) (9.7:1 ratio upheld); *Malco, Inc. v. Midwest Aluminum Sales, Inc.,* 14 Wis.2d 57, 109 N.W.2d 516 (1961) (15:1 ratio upheld). Indeed, in some cases the purposes of punishment and deterrence may only be achieved when the award is such as to adequately impress upon the defendant and others the seriousness and harmful consequences of a particular form of misconduct.

 In this case the jury considered an abundance of evidence from which it could reasonably conclude that Robins' conduct was such as to justify a substantial assessment of punitive damages. Robins' marketing program occurred over a long period of time, was directed to a vast array of unwary consumers, and was accompanied by false claims of safety and a conscious disregard of life threatening hazards known by it to be associated with its product. Robins accumulated gross revenues that exceeded $11,000,000 from the shield alone, and its net worth nearly doubled during the marketing period of this device, reaching $157,695,000 in 1974. Additional

evidence showed that Robins' yearly net earnings ranged from $19,000,000 to $27,000,000 during the period of 1971 to 1974. The net worth of the company in 1977 was $219,242,000, with net earnings of $26,801,000, and in 1978, the year immediately preceding the trial, these figures increased to $240,275,000 and $29,916,000 respectively. We cannot say, under the facts of this case, that the jury was motivated by passion or prejudice in reaching its verdict or that the verdict is excessive as a matter of law. The sum of $6,200,000 is neither grossly disproportionate to the amount of actual damages sustained by Palmer, nor, in light of Robins' financial condition, unconscionably oppressive. We see no reason to view the verdict as other than the conscientious decision of a jury to punish a wrongdoer with a penalty commensurate with the seriousness of the misconduct and the financial ability of the offender to pay and, concomitantly, to deter Robins and others from similar acts of misconduct in the future.

The judgment is affirmed.

ERICKSON, C.J., and ROVIRA, J., dissent.

DUBOFSKY and KIRSHBAUM, JJ., did not participate.

ERICKSON, Chief Justice, dissenting:

I respectfully dissent. In my view, reversible error occurred which requires that the defendant, A.H. Robins (Robins) be granted a new trial. Because of errors in the admission of evidence and the district court's instructions to the jury, the jury's verdict should be set aside and the case remanded to the district court for a new trial. The district court also permitted evidence to be introduced at trial, which in my view, had limited probative value which was greatly outweighed by its prejudicial effect. The cumulative prejudicial effect of the errors which occurred prevented the defendant from receiving a fair trial. *See People v. Botham*, 629 P.2d 589 (Colo. 1981).

I.

*Evidentiary Issues*

Robins appealed from rulings on a number of evidentiary issues, asserting that prejudicial hearsay and irrelevant evidence was admitted at trial and that the cumulative effect of the trial court's rulings was to allow highly inflammatory and prejudicial information to color the jury's deliberations on both the liability and damages issues. I disagree with the majority's analysis of the evidentiary issues.[1] In my view, prejudicial evidence was admitted which prevented Robins from receiving a fair trial.

A. *Adverse Reaction Reports*

Robins, like most pharmaceutical concerns, maintains a system for continuously monitoring feedback from physicians and consumers about the use of its products. Most drugs and prescription medical devices have unavoidable side effects. In spite of tests made by a pharmaceutical firm before a product is marketed, many side effects are unknown before the product is sold to the public and the full panoply of problems tied to the use of a drug or product is only discovered after widespread use. Since no pre-marketing testing program is absolutely accurate, reports from physicians and consumers are especially important in providing a pharmaceutical company with information on the dangers and benefits of its products.

Robins employed a doctor to review complaints, comments, and reports which it received on the Dalkon Shield. Most of the information involved so-called "adverse reactions" to the product—unplanned pregnancies, perforations, infections, and the like. A great majority of the reports involved medical problems different from those which Palmer experienced.

A manufacturer of a product has a duty to warn possible consumers of dangers which are not obvious. Labels which reasonably inform consumers of the dangers are adequate to comply with the duty to

1. I agree with the majority's conclusion that those challenged portions of Dr. Preston's memorandum (Exhibit HHH) were inadmissible hearsay.

warn. Admittedly, a failure to warn can give rise to a claim for negligence. *Bailey v. Montgomery Ward & Co., Inc.*, 635 P.2d 899 (Colo.App.1981); *see also Howard v. Avon Products, Inc.*, 155 Colo. 444, 395 P.2d 1007 (1964); *Restatement (Second) of Torts* § 399 (1965).

A failure to provide adequate warning may also result in a strict liability claim. We have held that products unaccompanied by sufficient warnings or instructions for use may be found defective and unreasonably dangerous. *Anderson v. Heron Eng. Co., Inc.*, 198 Colo. 391, 604 P.2d 674 (1979); *Union Supply v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978); *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975); *Potthoff v. Alms*, 41 Colo.App. 51, 583 P.2d 309 (1978); *Restatement (Second) of Torts* § 402A, comment j (1965). Warnings for prescription drugs are sufficient if addressed to physicians and pharmacists and not to the ultimate consumer. *Hamilton v. Hardy*, 37 Colo.App. 375, 549 P.2d 1099 (1976).

In this case, Palmer proceeded on theories of negligence and strict liability. As a part of her case, Palmer submitted evidence that would tend to show that Robins knew of the dangerous propensities of the Dalkon Shield, but that it chose, nevertheless, not to inform the medical profession and users of the Dalkon Shield of those dangers. The evidence consisted in part of the adverse reaction reports which were admitted over Robins' objection.

Objectionable hearsay evidence consists of out-of-court statements offered for the purpose of proving the truth of the matter asserted. *Id. See also Empire Diesel, Inc. v. Brown*, 146 Colo. 477, 361 P.2d 964 (1961); C.R.E. 801. Hearsay evidence may, however, be admitted to prove notice since it is irrelevant whether the information as to notice is truthful or not. Notice evidence was offered to establish that Robins failed to comply with its duty to provide warnings of dangerous conditions connected with its product, as well as conditions which have not been proved to be linked to the product but which were reported. *Cf.*

*Hamilton v. Hardy*, 37 Colo.App. 375, 549 P.2d 1099 (1976).

The majority concludes that, although the adverse reaction reports included references to consequences unrelated to the injuries suffered by Palmer, the "nature of those other reported incidents did not impair the legal relevancy of the evidence." I disagree.

Palmer suffered a septic abortion. The adverse reaction reports included claims and reports of uterine perforation, ectopic pregnancy, difficult insertion or removal, expulsion, and pelvic inflammatory disease. Evidence of prior dissimilar events is inadmissible to prove liability. *Blackburn v. Tombling*, 148 Colo. 161, 365 P.2d 243 (1961); *Millenson v. Department of Highways*, 41 Colo.App. 460, 590 P.2d 979 (1978). Unless the prior tortious conduct is similar, the probative value of the unrelated acts is outweighed by considerations of unfair prejudice to the defendant, undue consumption of time, and distraction of the jury's attention from the issue of the defendant's responsibility for the plaintiff's injuries. *See McCormick's Handbook on the Law of Evidence*, § 200 (E. Cleary 2d ed. 1972); *see also Uitts v. General Motors Corp.*, 411 F.Supp. 1380 (E.D.Pa.1974); C.R.E. 403 (judge must weigh prejudicial effect of evidence against its probative value).

In this case, where the strict products liability issue focused on the defectiveness of the Dalkon Shield, it was highly prejudicial to admit evidence of dissimilar events merely to establish notice. The evidence was particularly prejudicial in view of the fact that Robins admitted knowing of incidents involving undesirable side effects from the use of the Dalkon Shield. The adverse reaction reports strike too broadly. The reports relate to a number of complaints and to different intrauterine devices. There is no comparison of whether the reports or data collected was unusual for intrauterine devices. Under Palmer's theory of notice, prejudicial hearsay evidence is admissible merely because it purports to show that injuries occurred.

When the evidence relates to dissimilar incidents, the potential for prejudice is obvious. Evidence offered to establish notice is susceptible of misleading the jury in cases where a defect in a product is alleged to have caused a particular injury and evidence of other type injuries only establishes that the product was unsatisfactory for a number of different reasons. It cannot be claimed that difficulty in inserting or removing the Dalkon Shield or many of the other adverse reactions suffered by the users tended to prove that the Dalkon Shield caused Palmer to suffer a septic abortion. Dissimilar incidents create a perception of dangerousness and prevent a manufacturer from receiving a fair trial on the liability issue. Given the dissimilarity of Palmer's injuries to the problems reported in the adverse reaction reports and their highly prejudicial character, it was, in my opinion, an abuse of discretion for the trial court to admit the reports.

B. *Robins' Computer Records—Exhibit 559*

Palmer introduced a computer print-out which listed data that Robins had compiled on septic abortions. The data was collected in 1975 as Robins faced an increasing number of lawsuits arising out of the sale and use of the Dalkon Shield. Exhibit 559 was apparently a summary of reports that Robins received from doctors around the country on septic abortions occurring from the asserted use of a number of different IUDs.

The trial court admitted the print-out, cautioning that data relating to septic abortions occurring before plaintiff's injuries was admissible on the issue of notice; and that the remaining data was admissible for use as "circumstantial evidence" relating to "whatever inferences the jury wishes to draw, if any, of the statistical nature of this report relative to causation." The court warned, however, that the "jury should not consider as true the facts that

came in these reports so far as causation is concerned."

I disagree with the majority's holding that the exhibit qualified for admission under both the business record exception and the general hearsay exception, and must conclude that the report was erroneously admitted except as to the issue of notice.[2] Even if the document was relevant on the causation issue, admission of the evidence was precluded by the hearsay rule. If the Dalkon Shield in fact had a higher incidence of septic abortions than other IUDs, the report may have had probative value as to causation but the prejudice to Robins and the assumption of unproven facts should have foreclosed admission of the evidence. One of Palmer's expert witnesses even acknowledged that the print-out was meaningless unless accepted as true. While the report is of some value on the issue of notice, it cannot be helpful on the issue of causation without an adequate foundation which shows the statistical accuracy and reliability of the data.

The probative value of the post-injury print-out data is far outweighed by the prejudicial effect on the jury. The relevance of the exhibit on the causation issue depends entirely on the accuracy and comprehensiveness of the hearsay document. The statistical data is highly prejudicial and the record discloses nothing about how it was collected. Many of the patients' names are unreported and the date of injury is not reported in all cases. The permissible inferences from the evidence on causation are attenuated and prejudicial. In my view, the computer print-out should not have been admitted at trial except on the issue of notice as to those injuries reported before Palmer's injury and should not have been admitted without more definitive instructions on its limited relevance.

C. *Dr. Christian's Article—Exhibit 56*

The trial court admitted a medical journal article written by a Tucson, Arizona physician which questioned the safety of

---

**2.** Many of the reports consisted of accidents reported to Robins before Palmer's septic abortion.

IUDs. *See* Christian, *Maternal Deaths Associated with an Intrauterine Device*, 119 Am.J. Obstetrics & Gynecology 441 (1974). The article contained a number of case studies where women became seriously ill or died after becoming pregnant while wearing an IUD. The article mentioned the Dalkon Shield specifically as one of the IUDs involved in several of the case studies.

The majority finds that, although the trial court should have admitted the exhibit only for the limited purpose of serving as a foundation for Dr. Christian's expert opinion, the admission of the article without a limiting instruction was not reversible error. I do not agree.

The article was published nearly eight months after Palmer's incident. It raises questions about septic midtrimester abortions, but does not reach any conclusions. The article only calls for more study and an investigation. The reliability of the information contained in Dr. Christian's article was never established and the record discloses that in at least one instance, the type of IUD worn by a patient was erroneously reported as a Dalkon Shield. Moreover, the article takes on a highly prejudicial character because of its appearance in a prominent medical journal, despite its lack of extensive data and any real conclusions. Thus, the potential for jury confusion was exacerbated by the admission of obvious hearsay evidence that had little probative value. Because of the article's tenuous reliability and its post-injury publication date, the article should not have been admitted into evidence.

## II.

### Sufficiency of Evidence on Negligence Claim

The majority finds that the ultimate determination of whether Robins' conduct comported with that degree of care which a reasonably prudent drug manufacturer would use under the same or similar circumstances was well within the province of persons of ordinary intelligence and, therefore, expert opinion evidence was not essential to Palmer's claim in negligence. I disagree with the majority's conclusion.

The trial court instructed the jury that Palmer was entitled to recover on a theory of negligence if Robins' conduct was not that of a "reasonably prudent pharmaceutical company under the same or similar circumstances." Specifically, Palmer contended that Robins unreasonably failed: (1) to warn consumers of dangers and risks associated with the use of the Dalkon Shield; (2) to investigate reports of adverse reactions to the Dalkon Shield; (3) to test the Dalkon Shield before marketing the product; (4) to control the marketing and promotion campaign and thereby created an unreasonable risk of injury to potential users of the Dalkon Shield.

To recover in negligence, a plaintiff must prove by a preponderance of the evidence that the defendant breached a legal duty owing to the plaintiff, proximately causing damages. *Independent Lumber Co. v. Leatherwood*, 102 Colo. 460, 79 P.2d 1052 (1938). Courts must determine as a matter of law the existence of a duty and the applicable general standard of conduct. *See* W. Prosser, *Handbook on the Law of Torts* 205 (4th ed. 1971). It is the role of juries, however, to apply the facts of a particular case to legal standards set forth in the jury instructions. If the standard of care to which a reasonable person should conform is outside the common knowledge and experience of a lay jury, *e.g.*, medical standards of care, then expert witnesses may be called for purposes of establishing the standard of care. *Hamilton v. Hardy*, 37 Colo.App. 375, 549 P.2d 1099 (1976). *See also Seaman Unified School District v. Casson Construction Co., Inc.*, 3 Kan. App.2d 289, 594 P.2d 241 (1979) (standard for architects).

In my view, the average lay jury is not capable of determining without expert guidance the conduct required of a reasonably prudent pharmaceutical company. Most manufacturers and distributors of pharmaceutical products which sell unavoidably unsafe drugs or devices engage in

continuous supervision and control of their products. Many products do not manifest adverse side effects until years after their manufacture. *E.g., Beshada v. Johns-Manville Products Corp.*, 90 N.J. 191, 447 A.2d 539 (1982) (concerning asbestos related injuries). The testing and marketing of drug products occurs in a heavily regulated atmosphere (both state and federal) and involves differing monitoring considerations for different kinds of products. An average lay jury would not have the skill or expertise to determine a base line of reasonable conduct for a pharmaceutical concern to which the conduct in a particular case could be compared. Accordingly, the plaintiff should have been required to establish, as part of her case, the appropriate standard of care for a reasonable pharmaceutical concern. The standard of care for a manufacturer of pharmaceutical products, while established by expert testimony, is ultimately still a question of law for the courts to review. W. Prosser, *supra.*

### III.

*Issues Relating to Punitive Damages*

In my view, the majority has properly stated the law on many of the issues relating to punitive damages. I am in accord, for example, with the majority's finding that, under certain circumstances, punitive damages are recoverable in connection with a strict liability claim founded on section 402A of *Restatement (Second) of Torts.* I disagree, however, with the majority's affirmance of a jury award of $6,200,000 as punitive damages and the conclusion that the award was not a product of passion and prejudice and, therefore, excessive as a matter of law. I am also convinced that the excessive verdict derives, at least in part, from the district court's inadequate instruction on the factors which may properly be considered in determining a proper standard for assessing a monetary award of punitive damages.

The defendant's financial condition is a proper factor to consider in determining whether punitive damages should be awarded. *Leidholt v. District Court,* 619

P.2d 768 (Colo.1980); *McAllister v. McAllister,* 72 Colo. 28, 209 P. 788 (1922); *Courvoisier v. Raymond,* 23 Colo. 113, 47 P. 284 (1896); *Miller v. Carnation Co.,* 39 Colo. App. 1, 564 P.2d 127 (1977).

Evidence of financial worth, however, upon which a jury bases a punitive damages award, must be representative of the true financial condition of the defendant. The goal of admitting evidence of financial worth is to present as accurate a picture of financial worth as possible. Financial evidence should not mislead or permit a jury to reach a false conclusion based upon inaccurate or incomplete financial data. We have held that, irrespective of the defendant's wealth, punitive damages must bear a reasonable relationship to compensatory damages and that no "fixed mathematical formula exists to determine reasonableness." *Miller v. Carnation Co.,* 39 Colo. App. 1, 564 P.2d 127 (1977). *See also Mailloux v. Bradley,* 643 P.2d 797 (Colo.App. 1982). A trial court may consider the wealth of the defendant in determining the appropriate amount of punitive damages in a given case. *Starkey v. Dameron,* 92 Colo. 420, 21 P.2d 1112 (1933) (Butler, J., concurring). *See also Vollert v. Summa Corp.,* 389 F.Supp. 1348 (D.Haw.1975).

The danger of jury confusion on the financial status of a corporate defendant is well illustrated in this case. The plaintiff sought to establish the net worth, sales, and profit figures of Robins for purposes of applying the punitive damages statute by introducing a series of corporate annual reports. The jury was also told that Robins' gross profit (before tax) on Dalkon Shield sales over the years it was marketed was nearly $12 million. That figure, however, only represented net sales and was not an accurate characterization of the profit figures for the Dalkon Shield which were never introduced at trial. If the jury used the $12 million as a basis for its $6.2 million award of punitive damages, which seems reasonable in view of Palmer's arguments which appear in the record and the trial court's acceptance of the figure in its denial of Robins' motions for new trial and

remittitur, then the award is badly skewed in favor of Palmer. A punitive damages award should not be the result of jury speculation. *See Alley v. Gubser Development Co.*, 569 F.Supp. 36 (D.Colo.1983) (ratio of 10:1 held excessive).

Although it is difficult to set forth a hard and fast rule governing exactly what financial figures a jury should consider, it is grounds for remittitur or new trial for a jury to consider prejudicial information which is worthless, irrelevant, and misleading. The trial court must be diligent in screening evidence of financial worth so that the award furthers the purposes supporting punitive damages and does not add to jury confusion or prejudice. In my view, the massive amount of punitive damages awarded in this case is not supported by evidence of Robins' financial condition admitted at trial and thus constitutes error. The inaccurate financial information produced and argued at trial provided no rational foundation for the jury's award and was highly prejudicial to Robins.

The majority's failure to consider the economic effect on Robins of multiple punitive damage awards in its review of the award in this case may prompt future awards in favor of other plaintiffs that will pyramid the punitive damages against Robins to a confiscatory level. *See* Wheeler, *The Constitutional Case for Reforming Punitive Damages Procedures*, 69 Va.L. Rev. 269, 270–73, 285–88 (1983).

The remedy of punitive damages, with deep roots in ancient law, and in medieval English statutes, first received explicit recognition in 1763 in *Huckle v. Money*, 2 Wils. 205 (K.B.1763). There, the jury was held justified in going beyond the "small injury done to the plaintiff" because of the desirability of taking account of "a most daring public attack made upon the liberty of the subject" through entry and imprisonment pursuant to "a nameless warrant." *Id.* at 206. Later decisions which extended the remedy to situations where the defendant showed a conscious and deliberate disregard of the interests of others, still resembled those first cases in one important

respect—a high probability that the number of plaintiffs will be few and that they will join, or can be forced to join, in a single trial. *See Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir.1967).

The punitive damage remedy was transported to America, and by the middle of the nineteenth century, gained substantial acceptance in this country. *See* Owens, *Punitive Damages in Products Liability Litigation*, 74 Mich.L.Rev. 1258 (1976). The purpose behind the imposition of punitive damages was, and continues to be, to punish the defendant for the commission of an aggravated or outrageous act of misconduct and to deter him and others from such conduct in the future. Historically, the torts for which punitive damages were awarded were intentional torts involving a *single* victim. *Roginsky*, 378 F.2d 832.

Although the remedy of punitive damages is now firmly established by statute and as part of the common law, many critics have concluded that the concept is being abused. Any expansion, therefore, of its application to areas of the law which are only now developing and taking on a distinct character of their own, must be carefully scrutinized.

I have no quarrel with the majority's acceptance of the concept of punitive damages in the field of products liability litigation. My problem lies more fundamentally with the majority's application of the punitive damages doctrine here, where there exists the possibility that Robins may be financially overwhelmed by subsequent punitive damage awards comparable to the award in this case. The majority opinion justifies the use of the same evidence that was utilized in this case as evidence which can support additional awards in subsequent cases.

The unfair financial pyramiding of liability for punitive damage claims on the part of multiple plaintiffs throughout the United States is staggering. *See Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506 (5th Cir.1984) (punitive damages are inappropriate in asbestos litigation). Admittedly, I have difficulty in perceiving how

claims for punitive damages in such a multiplicity of actions throughout the nation can be administered in such a way as to avoid overkill and unwarranted cumulative financial punishment. *See Roginsky,* 378 F.2d 832. One solution is the so-called "one-bite/first comer" proposal which would limit recovery of punitive damages to the first litigant. *See generally State ex rel. Young v. Crookham,* 290 Or. 61, 618 P.2d 1268 (1980). A second alternative would allow for the introduction of evidence by the defendant of prior awards of punitive damages or of criminal sanctions. A third proposal would require that all related cases be assembled before a single court. Such a consolidation of claims would make it possible for a jury to make one punitive damage award which could then be held in trust for appropriate distribution among all successful plaintiffs. *See Roginsky,* 378 F.2d 832; *see also* S.44, 98th Cong., 1st Sess. (1983) (Product Liability Act) (stating that triers of fact, in determining the amount of a punitive damage award in a products liability setting, "shall" consider as one factor, among many, "all resolved and pending claims against the manufacturer or product seller with respect to the product ...").

None of these proposals, however, offers a complete answer to this pressing concern; yet, each recognizes expressly the need for drastic judicial or legislative control of the amount of punitive awards in order to keep the cumulative prospective total within some manageable balance. *See also Jackson,* 727 F.2d 506.

In my mind, the majority's failure to address and limit the award of punitive damages raises the specter of unnecessarily excessive punitive damage awards in a cumulative tort setting in subsequent cases. "The anticipation of multiple litigation for compensation damages serves in this instance as an effective deterrant to future illicit conduct." *Jackson,* 727 F.2d at 526. An examination of the economic effect on Robins of multiple punitive damage awards was warranted and would have been appropriate in this case.

## IV.

I am convinced that the cumulative prejudicial effect of the above-stated admissions of evidence along with the erroneous jury instructions prevented the defendant from receiving a fair trial. I would set aside the jury's verdict in this case and remand to the district court for a new trial. *People v. Botham,* 629 P.2d 589 (Colo.1981).

ROVIRA, Justice, dissenting:

I join with the Chief Justice in his dissent, except for that part in which he expresses agreement with the majority that "punitive damages are recoverable in connection with a strict liability claim founded on section 402A of *Restatement (Second) of Torts.*" Dissent at 225.

In 1976 this court unanimously adopted section 402A in *Hiigel v. General Motors,* 190 Colo. 57, 544 P.2d 983 (1976). We held that a manufacturer's strict tort liability did not rest upon the normal rules of foreseeability, but upon the concept of enterprise liability for placing a defective product into the stream of commerce. We noted with approval the concept that strict tort liability shifts the focus from the conduct of the manufacturer to the nature of the product.

In addition, the court concluded that the doctrine of strict liability covered damage to the product sold as well as injuries to persons and property. This extension of strict liability was decided by a divided court. In his dissenting opinion, Justice Lee, joined by Justices Kelley and Erickson, argued that remedies available to the plaintiff were better left "to the UCC warranty provisions ...." I read Justice Lee's dissenting opinion to mean that since the legislature had already provided a remedy, the court should not ignore that act and establish a different judicial remedy.

In 1977 the legislature responded to judicial adoption of strict liability in product liability cases by adopting sections 13–21–401 to –406, 6 C.R.S. (1983 Supp.), and sections 13–80–127.5 and –127.6, 6 C.R.S. (1983 Supp.). These statutory provisions

defined product liability actions and the doctrine of strict liability, established certain presumptions, and provided for a limitation of actions against manufacturers, sellers, or lessors.

Today, the court adopts yet another judicial extension of the principles of strict liability. It applies the remedy of punitive damages to the perceived legal void created by the failure of strict liability to adequately punish those who market a product in disregard of consumer safety. In support of its decision, the court speculates that because the magnitude of cost to the offending party is uncertain, punitive damages will affect a manufacturer's decision to introduce a product in the marketplace, whereas if punitive damages were predictably certain, they would simply become another cost of doing business and thereby induce a reluctance on the part of the manufacturer to sacrifice profit by removing a correctible defect. At 218.

My disagreement with the majority on this issue starts out with its rejection of the difference between punitive damages and fault, and strict liability and no-fault. I believe that in a strict liability context, where the focus is on the nature of the product, punitive damages are not appropriate. However, more important than my disagreement as to whether punitive damages should be applicable in a strict liability claim is my view that adoption of such a remedy is an issue of public policy which should be decided by the legislature and not by judicial legislation.

The problems which arise from the application of punitive damages in strict liability cases are substantial and require the benefit of extensive research into the economic and social implications of such a decision. A few of the issues which come to mind are: the financial impact on defendants and industries subject to such awards; the number of times punitive damages can be awarded for the same defect; the relationship of punitive damages to compensatory damages; the effect of such awards on consumers; and the social desirability of allowing one litigant to retain the entire punitive damage award rather than placing the award in a fund for others who might be injured. Suggesting some of the important issues which might appropriately be considered by the legislature only serves to highlight the variety of interrelated problems which are better suited for legislative rather than judicial action.

Product liability law has developed at an ever increasing rate, and lawsuits in which claims for punitive damages have been added to claims for compensatory damages have increased at an exponential rate. This court has not had the benefit of public hearings and the advice of experts in order to arrive at a reasoned judgment as to whether punitive damages should be allowed in strict liability litigation. Until such time as the legislature acts, either permitting, denying, or authorizing such a remedy under limited circumstances, I would not impose another judicial remedy on the judicially adopted doctrine of strict liability in product liability cases.